**BRITISH STEEL CORPORATION, et al., Plaintiffs,**

**v.**

**UNITED STATES, et al., Defendants,**

**Allegheny Ludlum Steel Corporation, et al., Defendants-Intervenors.**

**Court No. 83-7-01032.**

United States Court of International Trade.

March 8, 1985.

See also 573 F.Supp. 1145, 578 F.Supp. 421.

Steptoe & Johnson Chartered, Washington, D.C. (Richard O. Cunningham, Charlene Barshefsky, Alice L. Mattice, and William Martin, Washington, D.C., of counsel), for plaintiffs.

Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, and Sheila N. Ziff, Washington, D.C., for defendants.

Collier, Shannon, Rill & Scott, Washington, D.C. (David A. Hartquist, Paul C. Rosenthal and Jeffrey S. Beckington, Washington, D.C., of counsel), for defendants-intervenors.

Stewart & Stewart (Eugene L. Stewart, Washington, D.C., of counsel), for amicus curiae Bethlehem Steel Corp.

NEWMAN, Senior Judge:

### Introduction

The novel issue raised, with far-ranging implications in international trade, is whether under the facts and circumstances presented here certain benefits provided by the United Kingdom (U.K.) government used to "restructure" British Steel Corporation's (BSC) steel-making facilities are subsidies subject to countervailing duties.

Pursuant to section 516A of the Tariff Act of 1930 (19 U.S.C. § 1516a) BSC, the only U.K. producer and/or exporter to the United States of stainless steel sheet and plate, and British Steel Corporation, Inc., the exporter's American affiliate, challenge the final affirmative countervailing duty determinations of the United States Department of Commerce, International Trade Administration (ITA), concerning stainless steel plate (48 Fed.Reg. 19048, April 27, 1983). Jurisdiction is conferred upon this Court by 28 U.S.C. § 1581(c). Briefly, plaintiffs contend that ITA acted arbitrarily and contrary to law in determining that certain U.K. government benefits provided to BSC from April 1977 through March 1982 were countervailable subsidies

and in calculating the value of the subsidies.

Before the Court are: (1) plaintiffs' motion for review of ITA's determinations upon the agency record in conformance with Court of International Trade Rule 56.-1; (2) defendants' cross-motion for review and for partial remand; and (3) defendants-intervenors' (intervenors) cross-motion for review.

### Administrative Background

On October 7, 1982 ITA received a petition from Allegheny Ludlum Steel Corporation, other American specialty steel manufacturers and United Steelworkers of America, filed pursuant to 19 U.S.C. § 1671 on behalf of domestic manufacturers of stainless steel sheet, strip and plate, alleging that certain benefits constituting subsidies within the meaning of section 1671 are being provided, directly or indirectly, to the manufacturers, producers or exporters in the U.K. of these stainless steel products.[1] The petition also included allegations of injury caused by the imports.[2]

On November 2, 1982 ITA initiated a countervailing duty investigation into the subsidy allegations contained in the petition (47 Fed.Reg. 49692). In due course, ITA notified the International Trade Commission (ITC) of its initiation of the investigations and on November 22, 1982 ITC made a preliminary affirmative injury determination respecting the involved stainless steel plate (47 Fed.Reg. 54180).

ITA issued its preliminary affirmative countervailing duty determinations on February 10, 1983, finding that the U.K. government was providing British manufacturers, producers or exporters of stainless steel sheet, strip and plate with benefits constituting subsidies (48 Fed.Reg. 6146). The programs preliminarily found to confer subsidies were: public dividend capital and new capital; National Loans Fund (NLF) loans and loan conversions; Regional development grants; and Iron and Steel Industry Training Board grants.

In its determinations, ITA applied the general principles and conclusions of law described in Appendices 2–4 of the "Final Affirmative Countervailing Duty Determinations on Certain Steel Products from Belgium" (47 Fed.Reg. 39304, 39316, September 27, 1982). Appendix 2 explained ITA's methodology for dealing with certain types of capital and financial subsidies, including grants, loans, loan guarantees and equity. ITA has since modified various aspects of its methodology in the "Subsidies Appendix", attached to its notice of "Cold-Rolled Carbon Steel Flat-Rolled Products from Argentina: Final Affirmative Countervailing Duty Determination and Countervailing Duty Order" (49 Fed.Reg. 18006 (April 26, 1984)).

ITA published its "Final Affirmative Countervailing Duty Determinations on Stainless Steel Sheet, Strip, and Plate from the United Kingdom" on April 27, 1983. 48 Fed.Reg. 19048 (1983).[3] The programs determined to confer subsidies were those mentioned in ITA's preliminary affirmative determination. ITA found that BSC was receiving subsidies at an *ad valorem* rate of 19.31 percent.

On June 10, 1983 ITC issued a final affirmative injury determination with respect to imports of stainless steel plate and made

---

**1.** ITA previously determined that BSC was receiving subsidies in connection with certain carbon steel products. 47 Fed.Reg. 39384, September 7, 1982.

**2.** As recently noted by our Court of Appeals:

The Department of Commerce and the International Trade Commission (ITC) share the responsibilities for a countervailing duty investigation. The ITA (as Commerce's delegatee) determines whether the manufacturers, producers, or exporters of the imported merchandise receive subsidies from their govern-

ments, and the ITC decides whether the subsidized imports are injuring or threatening to injure a domestic industry. (In certain circumstances, not appicable here, no injury determination is required.) *See* 19 U.S.C. § 1671, *et seq. Bethlehem Steel Corporation v. United States,* 742 F.2d 1405, 1407 (Fed.Cir. 1984), at n. 1.

**3.** These countervailing duty determinations are also challenged in *Allegheny Ludlum Steel Corporation v. United States,* Court No. 83–7–01035, which is *sub judice.*

negative determinations respecting stainless steel sheet and strip (48 Fed.Reg. 27454 (1983)).[4] Accordingly, on June 23, 1983 ITA issued a countervailing duty order only as to U.K. stainless steel plate (48 Fed.Reg. 28690). Subsequently, on July 21, 1983 plaintiffs instituted this action.

### Financial History of BSC

BSC was established on March 22, 1967 under the provisions of the Iron and Steel Act of 1967 by combining 14 steel firms into one nationalized company. The British government reimbursed stockholders of record and absorbed substantial debts of the individual companies. The bulk of the debt was converted to government equity under the provisions of the Iron and Steel Act of 1969, which also authorized government payments to BSC. Authority for the government to make payments to BSC was renewed by the Iron and Steel Act of 1975 (48 Fed.Reg. 19049). In nine of the 15 years of its existence, including every year since fiscal year 1974/75, BSC has received government payments, described by BSC prior to 1978/79 as Public Dividend Capital (PDC) and since 1978/79 as New Capital (NC). In 1972 and 1981, the British Parliament directed that portions of its capital investment in BSC be credited to accumulated revenue deficit.

In those same years, government loans from the NLF, established by the National Loan Fund Act of 1968, were also converted into equity. (Lending from the NLF is limited to nationalized companies and such loans must be authorized by an act of the British Parliament.) The Iron and Steel Act of 1967 authorized BSC to borrow from NLF's predecessor fund (the Consolidated Fund), and the Iron and Steel Act of 1975 authorized borrowings directly from the NLF. In 1971/72, all outstanding loans from the NLF to BSC were converted into equity, as were all NLF loan amounts outstanding as of the end of the 1980/81 fiscal year.

The direct government payments to BSC and the loan conversions (which also constitute equity investments) were essential, along with other programs, to the survival of BSC, which made a profit of 89 million pounds before taxes in the fiscal year 1974/75 (ending March 29, 1975) and has been losing money ever since.

### Issues Presented

Plaintiffs raise eight distinct issues: Points I, II and III of plaintiffs' memorandum address the interpretation and application of certain statutory concepts to benefits conferred by the British government upon BSC during fiscal years 1977/78 through 1981/82 that were found by ITA to constitute countervailable subsidies under 19 U.S.C. §§ 1671 and 1677. Points IV through VII of plaintiffs' memorandum challenge the valuation methodologies utilized by ITA in its investigation, which methodologies have since been revised and clarified. Defendants urge that since the valuation methodologies challenged by plaintiffs are not currently being utilized, this action should be remanded to ITA for redetermination respecting valuation of the subsidies in accordance with current methodologies. In Point VIII of its memorandum plaintiffs challenge ITA's determination that BSC was not creditworthy in fiscal year 1977/78 (the last year prior to restructuring) and consequently contest the finding that U.K. government equity infusions were provided on terms inconsistent with commercial considerations.

For the reasons indicated below, ITA's determinations are affirmed in part and this action is remanded to ITA for further proceedings respecting Points IV through VIII of plaintiffs' memorandum. Accordingly, the Court will not presently address

---

4. ITC's final negative injury determinations as to stainless steel sheet and strip ended the administrative proceedings as to those types of steel imports from the U.K. 19 U.S.C. § 1671b(a). Thus, the present action involves only stainless steel plate from the U.K. ITC's negative injury determinations respecting stainless steel sheet and strip from the U.K. are contested in *Allegheny Ludlum Steel Corp. v. United States,* Court No. 83–7–01027, which is *sub judice.*

the issues raised by plaintiffs in points IV through VIII.

## Opinion

## I.

### The Statutory "Commercial Considerations" Standard

■ Section 771(5) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677(5), includes any subsidy "bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise" including: "[t]he provision of capital, loans, or loan guarantees *on terms inconsistent with commercial considerations*". 19 U.S.C. § 1677(5)(B)(i) (emphasis added). There is no dispute that BSC received loans and capital from the British government during its restructuring period, fiscal year 1978/79 to the present. The restructuring funds comprised the general equity funding provided by the U.K. government from the beginning of fiscal year 1978/79 to the present used by BSC for general corporate purposes (working capital, coverage of operating loss, etc.) to enable the company to restructure; the forgiveness of indebtedness to the NLF is also included. Plaintiffs contend that ITA erred in determining that these funds were provided to BSC during the restructuring period on "terms inconsistent with commercial considerations" within the purview of the statute.[5]

This Court agrees with ITA's finding that BSC received government funding "on terms inconsistent with commercial considerations."

In addition to the financial background of BSC presented above, the following facts are pertinent:

The annual reports and accounts of BSC for fiscal years 1974/75 through 1981/82 paint a bleak picture of a company burdened, in the face of a severe economic recession, with, among other things, redundant/obsolescent plants and equipment, a redundant work force, and poor industrial relations. In 1978, BSC initiated a program of radical restructuring calling for a drastic reduction in productive capacity through closing of redundant plants and other facilities, retiring obsolescent equipment, reducing the work force, improving industrial relations, eliminating unprofitable production, streamlining and upgrading of the plants to be retained, introducing technological innovations, and cutting costs where possible in the hope of attaining a competitive position in domestic and foreign markets.

Nonetheless, even by the end of fiscal year 1981/82, BSC was still not out of the financial "woods", as evidenced by its "Annual Report and Accounts 1981–82". By the end of the 1981/82 fiscal year (April 3, 1982), BSC had incurred a huge loss of 358 million pounds after interest and taxation, and before extraordinary items. Moreover, the auditors included the following cautionary note (A.R. 616):

The accounts have been drawn upon the going concern basis which assumes that adequate finance will be forthcoming to meet operational needs. The validity of this assumption is uncertain because, as explained in general note I, the external financing limit set by the Government for the financial year ending March 1983, which included an allowance for normal contingencies:

(a) is subject to approval by the European Commission; and

(b) may prove inadequate if the stability assumed in the projections on which it is based does not obtain.

As explained in general note IV, there are continuing uncertainties in the steel market and there is a consequential uncertainty as to the level of future trading results. *Accordingly, we have not been able to satisfy ourselves that the amount of 1,579 million at which fixed assets are stated in the consolidated balance sheets (the Corporation's bal-*

---

**5.** Plaintiffs raise more specific issues respecting two classes of restructuring funds, addressed subsequently in Points II and III: whether "redundancy and closure funds" and funds associated with the purchase of assets prematurely taken out of use in the course of capacity reductions are funds used in the "manufacture, production, or export" of the subject merchandise.

*ance sheet £ 1,451 million) will be recoverable out of future earnings.* [Emphasis supplied.]

Against this dismal financial background, ITA considered whether the U.K. government's equity investments, or "infusions", constituted subsidies within the meaning of the countervailing duty law.[6] The term "subsidy" is defined in 19 U.S.C. § 1677(5):

(5) Subsidy. The term "subsidy" has the same meaning as the term "bounty or grant" as that term is used in section 1303 of this title, and includes, but is not limited to, the following:

(A) Any export subsidy described in Annex A to the Agreement (relating to illustrative list of export subsidies).

(B) The following domestic subsidies, if provided or required by government action to a specific enterprise or industry, or group of enterprises or industries, whether publicly or privately owned, and whether paid or bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise:

(i) The provision of capital, loans, or loan guarantees on terms inconsistent with commercial considerations.

(ii) The provision of goods or services at preferential rates.

(iii) The grant of funds or forgiveness of debt to cover operating losses sustained by a specific industry.

(iv) The assumption of any costs or expenses of manufacture, production or distribution.

Thus, in accordance with 19 U.S.C. § 1677(5)(B)(i), ITA had to determine whether funding was provided to BSC "on terms inconsistent with commercial considerations". In this connection ITA stated in its notice of final affirmative countervailing duty determinations (48 Fed.Reg. at 19049):

Our treatment of government equity investment in a company hinges essentially on the soundness of the investment. If the government investment was reasonably sound at the time it was made, we do not consider it a subsidy. If, on the contrary, the investment appears to have been unsound, a subsidy may exist. Government investment confers a subsidy only when it is on terms inconsistent with commercial considerations.

An equity subsidy potentially arises when the government makes equity infusions into a company which is sustaining deep or significant continuing losses and for which there does not appear to be any reasonable indication of a rapid recovery.

For the purpose of determining whether BSC represented a sound investment at the time each equity investment was made by the U.K. government, we primarily considered BSC's cash flow from operations, including interest, but excluding government grants. Our analysis also included BSC's operating results and computations of BSC's current ratio (current assets divided by current liabilities). On the basis of these tests, we considered investment in BSC to be inconsistent with commercial considerations from fiscal year 1977/78 through 1981/82.

Since we have determined that BSC was not a sound investment from April 1977 through March 1982, we examined the government's equity infusions during this period to determine whether they bestowed a subsidy. To the extent in any year that the government realized a rate of return on its equity investment in BSC which was less than the average rate of return on equity investment for the country as a whole (thus including returns on both successful and unsuccessful investments), its equity infusion is considered to confer a subsidy.

---

**6.** The same equity investments were considered in the Final Affirmative Countervailing Duty Determinations concerning certain carbon steel products from the U.K. (47 Fed.Reg. 39384, September 7, 1982). The bases for ITA's determinations in the carbon steel investigations were utilized in the stainless steel sheet, strip and plate proceedings.

With respect to the forgiveness of loans from the NLF, the notice states (48 Fed. Reg. at 19050):

Since the first forgiveness [1971/72] occurred during the period in which we consider equity infusions to be consistent with commercial considerations, it did not confer a subsidy. The second forgiveness [1981/82] was made during the period in which we consider equity infusions to have been inconsistent with commercial considerations, and potentially conferred a subsidy. We examined the rate of return on the second equity infusion and compared it to the national average rate of return on equity. Since the UK government realized a rate of return on equity investment in BSC which was less than the average rate of return on equity investment for the country as a whole (thus including returns on both successful and unsuccessful investments), we determined that a subsidy was in fact conferred.

In response to BSC's contention that ITA should not countervail against funding for restructuring because restructuring eliminates excess capacity, alleviating a form of trade distortion—consistent with the goals of our countervailing duty law and the GATT Subsidies Code—ITA stated (48 Fed. Reg. at 19053):

We disagree with BSC's interpretation of the countervailing duty law and the Code. Our statutory obligations are carefully defined and mandatory in nature. Whenever it is determined that subsidized imports are injuring the domestic industry that manufactures or produces a like product, we are *required* by domestic law, and authorized by the Code, to impose appropriate countervailing duties, provided, of course, that all relevant procedural requirements are satisfied.

As discussed in the preceding comment, we have determined that certain Public Dividend Capital is an equity investment provided on terms inconsistent with commercial considerations, and is therefore countervailable, regardless of whether some of the funds received from these capital infusions were used for restructuring or to purchase assets now idle as a result of restructuring. Therefore, we must countervail against these benefits.

Although Article 11 of Part II of the Code does provide, among other things, that a signatory's right to provide domestic subsidies for purposes of restructuring are not precluded by the Code, it does not exempt such subsidies from countervailing duties. Therefore, regardless of whether restructuring subsidies serve to alleviate other trade distortions, countervailing against such benefits is wholly consistent with the Code and our statute.

■ Plaintiffs also argue here that since the Trade Agreements Act of 1979 was intended to remedy trade distortions and funds expended for restructuring are intended to reduce or eliminate trade distortions, ITA misapplied the "commercial considerations" standard prescribed by the statute. However, plaintiffs' "trade distortion" theory is plainly without merit. *See ASG Industries, Inc. v. United States*, 67 CCPA 11, C.A.D. 1237, 610 F.2d 770 (1979); *ASG Industries, Inc. v. United States*, 82 Cust.Ct. 101, C.D. 4797, 467 F.Supp. 1200 (1979).

Further, pertaining to the question of whether government funds are provided to a company under conditions inconsistent with commercial considerations, the Subcommittee on Trade of the House Committee on Ways and Means observed in its *Summary of Recommendations for Legislation Implementing the Multilateral Trade Negotiations*, 96th Cong., 1st Sess. 4 (Comm. Print 21 (1979)):

With regard to the provision of capital, 'commercial considerations' shall mean consideration of whether at the time the capital is provided, the recipient is required, and can be expected within a reasonable period of time, to derive from its operations a reasonable rate of return on its invested capital.

ITA found that the U.K. government received a rate of return on its BSC invest-

ment lower than the average return on equity investment for the country as a whole (including returns on both successful and unsuccessful investments). Clearly, given BSC's deteriorating financial condition and precarious situation, no private sector investor expecting a reasonable return on his investment within a reasonable time would have given any consideration whatever to investing in BSC during the period of its restructuring. As aptly stated in defendants' memorandum at 22:

> The imperatives which committed the British government to saving BSC were not based upon the normal and usual commercial considerations of the market place. They were based upon a need to shore up a failing steel industry which would "recapture its home market share from imports and establish inroads to the export market" (A.R. 55), and thus strengthen an economy weakened by a worldwide recession, low productivity, obsolescent industries, and poor industrial relations, not to mention such other factors as national pride and the government's commitment to maintain its steel industry.

The Court also strongly disagrees with plaintiffs' contention that in determining whether government funds were provided on terms inconsistent with commercial considerations, the "rationality" of the restructuring must be considered. While government investment in its state-owned enterprises may indeed be rational in terms of national policy, such investment may not be consistent with commercial considerations, depending upon the soundness and terms of the investment. However, neither the reasonableness of the action taken by the government, nor the results ultimately achieved (viewed in retrospect), are pertinent to the "commercial considerations" test.

## II.

### Redundancy and Closure Funds

■ Plaintiffs claim that even assuming *arguendo* that U.K. government funds were provided on terms inconsistent with commercial considerations, ITA erred in determining that funds provided specifically for closure of inefficient plants and discharge of "redundant" work force (redundancy and closure funds) are countervailable since such funds do not benefit, either directly or indirectly, "manufacture, production or export". *See* 19 U.S.C. §§ 1671(a)(1) and 1677(5)(B). In plaintiffs' view, funds provided to shut down excess capacity and eliminate unnecessary jobs are for purposes that are the very antithesis of "manufacture, production or export", and thus are not countervailable under any circumstances.

However, the Court is in complete agreement with ITA's disposition of this issue (48 Fed.Reg. 19048, 19052–53):

> Moreover, subsidies used to close redundant facilities or to purchase idled assets clearly constitute countervailable benefits under the statutory definition of "subsidy." ... Clearly, redundancy funds and plant closures make the recipient *more efficient and relieve it of significant financial burdens.* Thus, such funds are unquestionably *indirect,* if not direct, benefits to BSC's manufacture, production or export of steel and consequently are countervailable. [Emphasis added.]

■ The apparent purpose of "restructuring," *viz.,* closing obsolete facilities, eliminating excess capacity and laying off unnecessary workers, is to reduce costs and enhance the competitiveness of the remaining enterprise. As a company becomes more cost efficient and thereby more price competitive, there is a direct benefit to the manufacture, production or export of all the firm's products. Thus, the use of government funds to finance improved efficiencies and competitive posture obviously provides direct benefits to BSC's manufacture, production or export. Whatever laudable objectives motivated the provision of funds for restructuring, the effect of the U.K. government's action was not only to assure the survival of a company that otherwise would be bankrupt, but to make the company more competitive in the market-

place. Significantly, the countervailing duty law concerns itself not with the government's purpose or intent in a particular program, but whether the government's funds give the country's exports an unfair competitive advantage. *Downs v. United States*, 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275 (1903) and *Nicholas & Co. v. United States*, 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919).

In the *Downs* and *Nicholas* teachings, the Supreme Court interpreted the statutory phrase "bounty or grant" when the countervailing duty law covered only exportation of merchandise. In 1922, the law was broadened to impose countervailing duties on any bounty or grant paid or bestowed, directly or indirectly, upon manufacture or production (as well as export) of merchandise. Tariff Act of 1922, ch. 356, § 303, 42 Stat. 858, 935. Consequently, even broader activities were and are covered by the countervailing duty law so long as they are benefitted by government funds and have resulted in a competitive advantage to the recipient.

More recently, in *Zenith Radio Corporation v. United States*, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978), the Supreme Court considered the question of what constitutes a bounty or grant under the countervailing duty law, and specifically relative to unfair competitive advantage observed (437 U.S. at 437 at 455–56, 98 S.Ct. at 2447–48):

> * * * This purpose is relatively clear from the face of the statute and is confirmed by the congressional debates: the countervailing duty was intended to offset the unfair competitive advantage that foreign producers would otherwise enjoy from export subsidies paid by their governments. See, *e.g.*, 30 Cong.Rec. at 1674 (remarks of Sen. Allison), 2205 (Sen. Caffery), 2225 (Sen. Lindsay) * * *

And in *ASG Industries, Inc., supra*, 82 Cust.Ct. at 114, 467 F.Supp. at 1230, the Court observed that "[t]he purpose of the [countervailing duty] law is to prevent unequal competition in our markets—to prevent foreign goods from competing with domestic goods at a lower price than they would be sold". The ASG Court emphasized that the nature of the exporter's cost reduction is immaterial (82 Cust.Ct. at 114, 467 F.Supp. at 1230):

> Against the plain language of the statute and the comprehensive judicial discussions of the predecessor provisions involving export bounties, we turn to the Italian programs in question. Unquestionably, the "effect" of these programs has been to reduce SIV's cost of producing float glass. And whether the reduction in cost is occasioned by direct cash payments, or by an act of government reducing labor cost, capital cost, or the cost of any other factor of production is of no consequence. For if a benefit or advantage is received in connection with the production of merchandise, that benefit or advantage is a bounty or grant on production. And to the extent that such bountied merchandise is exported to the United States, it comes squarely within our countervailing duty law—section 303. *See also:* S.Rep. No. 249, 96th Cong. 1st Sess. 37 (1979).

In sum, the British government's domestic purposes in providing funds to BSC for "restructuring" are not controlling of the question of whether such largess constitutes countervailable subsidies. Rather, as noted *supra*, the concept of a countervailable subsidy in the context of the present case focuses upon the unfair competitive advantage granted by the British government's provision of funds to reduce BSC's production costs. By providing massive funding to help BSC eliminate obsolete facilities and unneeded labor, the British government reduced BSC's cost of producing steel and gave BSC precisely the kind of unfair competitive advantage that Congress sought to equalize through the application of countervailing duties.

█ Further, the Court agrees with defendants' contention that since the equity investments in BSC benefitted all of its remaining manufacturing and exporting operations, it is unnecessary to trace the use of such funds or to find that they

directly related to enhanced product competitiveness. "General financial benefit to the production is sufficient to support a determination of subsidy and a quantification of exact competitive benefit to the products need not enter into the allocation of the benefit." *Michelin Tire Corporation v. United States,* 4 CIT 252, 255 (1982).[7] The Court also agrees with intervenors' argument that funding to cover closure and redundancy costs are countervailable on the basis of the amount of funding BSC received, and that the extent to which BSC improved its efficiency by the use of the funds (which would be extremely difficult to quantify) is irrelevant. Hence, plaintiffs' argument that funds to cover redundancy and closure costs are not countervailable because efficiency gains are too remote and nonquantifiable is without merit.

■ Finally, plaintiffs attack what they claim to be ITA's assumption that funds received by BSC are "fungible", *viz.,* "government funds invested in a firm enter one large pool that may be used for any purpose that the firm desires". (Plaintiffs' memorandum, at 44). Plaintiffs insist that viewing money as fungible violates the countervailing duty law's requirement of "precisely calculated duties on particular products" (*Id.*). The Court agrees with intervenors' argument that although the funds received by BSC were untied to specific assets and treated by BSC as fungible, such funding is countervailable on a *pro rata* basis to the production of a particular product like stainless steel plate. If prorating were not allowed, a program could readily escape countervailing duties simply by the government's direction that its grants be used for "general" purposes. The short of the matter is ITA properly allocated a share of the funds provided to BSC for redundancy and closure costs to the products benefitted, including a proration to stainless steel plate.

7. Opinion vacated in accordance with parties' submission on agreed statement of facts.

## III.

### *Funds for Purchase of Capital Assets Prematurely Taken Out of Use in the Course of Capacity Reduction*

■ Further predicated upon the statutory language "manufacture, production, or export" in 19 U.S.C. § 1677(5)(B), plaintiffs contend that ITA is prohibited from imposing countervailing duties over a period of years upon subsidized funding used by BSC to acquire capital assets prematurely taken out of use in the course of capacity reductions incident to restructuring. In plaintiffs' view, even assuming ITA correctly found that assets were initially acquired with funds provided on terms "inconsistent with commercial considerations", all benefits to "manufacture, production, or export" abruptly cease when an asset is taken out of use, and from that point on there is no subsidy to countervail. Thus, according to plaintiffs, ITA erred in imposing countervailing duties over the full fifteen year anticipated useful life of assets prematurely retired, since the assets actual useful life, and therefore the actual commercial and competitive benefit of the subsidy, was curtailed. In short, plaintiffs' position is that a *capital asset* confers no further benefit to "manufacture, production, or export" after it is taken out of use, and consequently ITA must recognize in full ("expense") the undepreciated cost of the asset in the year it is taken out of use in conformance with generally accepted accounting principles.

The Court cannot agree with plaintiffs' hypothesis that the funds used to acquire assets prematurely retired confer no benefit after the asset is taken out of use. Fundamentally, the value of a subsidy must be measured in accordance with its benefit to the recipient, which is not necessarily limited to the period of time assets are actually used. Plaintiffs' argument confuses the benefit conferred by the use of the *asset* with the benefit conferred by the use of the *subsidy* to acquire the asset. Plainly, after an asset is taken out of ser-

*Michelin Tire Corporation v. United States,* 9 CIT—, Slip Op. 85–11 (January 28, 1985).

vice, the asset itself does not continue to provide a benefit to the firm. Nevertheless, the Court agrees with defendants' and intervenors' position that the competitive benefit of funds used to acquire assets does not cease upon the asset's premature retirement, but rather such benefit continues to contribute to the firm's manufacture, production, or exportation of products accomplished by the firm's remaining assets. Subsidies for the purchase of capital assets bestow a benefit to the recipient firm by relieving it not only of the immediate costs normally incurred in acquiring such assets (thereby freeing up other funds for other uses), but also by relieving the firm of the continuing annual costs of acquiring an asset. As the Court observed in *Michelin Tire Corporation v. United States*, 6 CIT ——, Slip Op. 83–136 (December 22, 1983),[8] regarding to the benefits which result as a direct consequence of a subsidy:

> The benefits which must be withdrawn by payment of duty in the case of a subsidy are the benefits which result as a direct consequence of the subsidy. For a business, the direct consequences of receiving a gift of money normally are the elimination of the necessity of looking elsewhere for those funds and paying the price required by the alternative source of funds. The normal alternative sources of funding for business enterprises are two—the sale of shares in the business, carrying with it the obligation to share the profits, or the incurring of debt, carrying with it the obligation to repay the creditor with interest.

While plaintiffs urge that for the years after the assets were taken out of use, "it is just as if British Steel had given the assets back to the government", plaintiffs overlook the fact that neither the assets nor the funds received by BSC were returned in any form to the government.

Plaintiffs also insist that after an asset is retired there is no continuing obligation to repay a loan used to acquire the asset since

8. Opinion vacated in accordance with parties' submission on agreed statement of facts.

under standard commercial practice, a repayment obligation is accelerated and the remaining balance becomes due and payable at the time of the asset's retirement. However, acceleration clauses applicable to loan defaults, relied upon by plaintiff to prove their point, are entirely inapposite to premature retirement of assets. In brief, after retirement of its assets, BSC did not repay the funds to the government and had no obligation of repayment, and accordingly BSC continued to benefit from the subsidy.

For the foregoing reasons, the Court concludes there is no merit in plaintiffs' contention that funds used to acquire capital assets cannot be countervailed after the assets have been prematurely taken out of use.

IV.

*Remand of Action Respecting Points IV through VIII of Plaintiffs' Memorandum*

Plaintiffs contend that they are entitled to judicial review of ITA's determinations on the basis of the existing record, including the valuation methodologies heretofore employed by ITA. However, for the reasons indicated below, the Court concludes that the granting of defendants' request for remand of the action respecting points IV through VIII of plaintiffs' memorandum is warranted.

As previously noted, in its determinations on stainless steel sheet, strip and plate from the United Kingdom, ITA applied the general principles and conclusions of law described in Appendix 2, *supra*. In Appendix 2, ITA explained its methodology for valuing certain types of subsidies that arose in a number of countervailing duty proceedings. However, since publishing Appendix 2, ITA has adopted a number of significant changes in its valuation methodologies, which were incorporated into the "Subsidies Appendix", *supra*.

*Michelin Tire Corporation v. United States,* 9 CIT ——, Slip Op. 85–11 (January 28, 1985).

Points IV through VII of plaintiffs' memorandum involve challenges to Appendix 2 Methodologies that have since been superceded in the Subsidies Appendix, and for that reason defendants request that this action be remanded respecting Points IV through VIII of plaintiffs' memorandum for revaluation and recalculation of the subsidies. Defendants advised the Court that the revised methodology was utilized in the first annual administrative review (19 U.S.C. § 1675). As aptly pointed out by defendants, although plaintiffs are making *estimated* countervailing duty deposits at the rate specified in the final affirmative determination, the *actual* net subsidy will be calculated upon the rate determined by the current annual review. Consequently, any decision concerning the correctness of the methodologies heretofore used in valuation of the subsidies would have little, if any, application (except on the deposit rate) since it would concern methodologies no longer employed by ITA. Hence, the Court must agree with defendants that judicial resources would be best utilized by remanding this action and considering the viable issues involving the valuation methodologies currently employed by ITA, rather than resolve them in a later suit challenging the final results of the first annual review.

Additionally, this action is remanded respecting another aspect involving Point VIII of plaintiffs' memorandum. Defendants advised the Court that the information utilized by ITA to support its determination, obtained from the administrative record in the Final Affirmative Countervailing Duty Determinations concerning certain carbon steel products from the United Kingdom (47 Fed.Reg. 39384, September 7, 1982), was omitted from the record in this action. That information constitutes part of the administrative record for review in connection with the issues raised by Point VIII in plaintiffs' memorandum—*viz.*, creditworthiness of BSC during fiscal year 1977/78. Therefore, pursuant to 19 U.S.C. § 1516a(b)(2), this information must be added to the record. As mentioned, *supra*, the action is remanded respecting Point VIII

also for the reason that the methodology employed by ITA in calculating subsidies as a result of equity infusions has been revised by the Subsidies Appendix.

In the interest of judicial economy, then, defendants' request for remand of this action respecting Points IV through VIII of plaintiffs' memorandum is granted.

### Conclusion

For the foregoing reasons, it is hereby ORDERED that:

1. ITA's affirmative countervailing duty determinations respecting stainless steel plate from the United Kingdom is sustained as to all matters addressed by Points I, II and III of plaintiffs' memorandum. Accordingly, the Court affirms ITA's determinations that the U.K. government's equity investments in BSC (consisting of payments of public dividend capital or new capital and the forgiveness of all outstanding loans from the NLF) constitute subsidies within the meaning of 19 U.S.C. § 1671;

2. To the extent not disposed of by this opinion, the matters addressed by Points IV through VIII in plaintiffs' memorandum are remanded to ITA for: (a) revaluation and recalculation of the subsidies in accordance with the "Subsidies Appendix", including valuation of redundancy and closure funds, funds associated with assets taken out of use, gains from extinguishment of indebtedness, "time value" of money, equity infusions during fiscal year 1977/78, and such other revaluations and recalculations as are necessary; and (b) to add to the record all information obtained and/or utilized by ITA in making its determination relative to Point VIII of plaintiffs' memorandum concerning the creditworthiness of BSC in fiscal year 1977/78.

3. ITA shall provide notice to interested parties of its proposed redeterminations and afford them reasonable opportunity for comment prior to submission of the actual redeterminations to the Court.

4. The Secretary or his delegate shall report his findings and redeterminations to

this Court, and supplement the administrative record as provided above, within 120 days after the date of entry of this order.