**USINOR SACILOR, Unimétal, and Ascométal, Plaintiffs,**

v.

**UNITED STATES, Defendant,**

and

**Inland Steel Bar Company, Defendant-Intervenor.**

**Slip Op. 97–5.**
**Court No. 93–04–00230.**

United States Court of International Trade.

Jan. 10, 1997.

Weil, Gotshal & Manges, New York City (M. Jean Anderson, Stuart M. Rosen, Mark B. Friedman, Diane M. McDevitt, David W. Oliver, and Jonathan Bloom), Washington, DC, for Usinor Sacilor, Unimétal, and Ascométal, plaintiffs.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Reginald T. Blades, Jr., Jeffrey M. Telep ); Office of Chief Counsel for Import Administration, United States Department of Commerce (Terrence J. McCartin, of counsel), for defendant.

Wiley, Rein & Fielding (Charles Owen Verrill, Jr., Alan H. Price, Peter S. Jordan and Carlos M. Nalda), Washington, DC, for Inland Steel Bar Company, defendant-intervenor.

### *MEMORANDUM and OPINION*

GOLDBERG, Judge:

This matter is before the Court after the International Trade Administration, U.S. Department of Commerce ("Commerce"), issued its final results of redetermination on October 24, 1995 ("*Redetermination* "). Commerce issued its *Redetermination* pursuant to this Court's remand in *Usinor Sacilor v. United States,* 19 CIT ——, 893 F.Supp. 1112 (1995) ("*Usinor Sacilor I* "). In *Usinor Sacilor I,* the Court reviewed Commerce's initial determination in *Certain Hot Rolled Lead and Bismuth Carbon Steel Products From France,* 58 Fed.Reg. 6221 (Jan. 27, 1993) ("*Initial Determination* "). This case involves an investigation of subsidies provided by the French government to Usinor Sacilor for the period of calendar year 1991. *Initial Determination,* 58 Fed.Reg. at 6222. The facts underlying this case are more completely set forth in *Usinor Sacilor I,* 19 CIT at ——, 893 F.Supp. at 1118–20.

In *Usinor Sacilor I,* the Court remanded the case to Commerce and ordered it to further consider three issues: (1) its use of the Internal Revenue Service's ("IRS") amortization tables to determine how long Usinor Sacilor benefited from countervailable non-recurring grants and equity infusions; (2) its decision to calculate the countervailing duty using domestic production levels for the sales denominator instead of worldwide production levels; and (3) its decision to analyze the specificity of loans made by Crédit National to Usinor Sacilor based on the period

in which the loans were consolidated by the lender in 1991 rather than based on the time period in which the loans were issued originally. 19 CIT ——, 893 F.Supp. 1112.

Revisiting these three issues today, the Court affirms the *Redetermination* with respect to issues one and three. The Court again remands with respect to issue two. The Court exercises jurisdiction under 28 U.S.C. § 1581(c) (1988).

## STANDARD OF REVIEW

■ When reviewing an agency's interpretation of statutory law, the Court must accord substantial weight to the agency's interpretation of the statute that it administers. *American Lamb Co. v. United States,* 4 Fed. Cir. (T) 47, 54, 785 F.2d 994, 1001 (1986) (citations omitted). Thus, an agency's "interpretation of the statute need not be the *only* reasonable interpretation or the one which the court views as the most reasonable" for the Court to uphold the agency's interpretation. *Consumer Prod. Div., SCM Corp. v. Silver Reed America,* 3 Fed. Cir. (T) 83, 90, 753 F.2d 1033, 1039 (1985) (emphasis in original).

■ If the statute is silent or ambiguous with respect to the specific issue, the question for the Court to decide is whether the agency's interpretation is based on a permissible construction of the statute. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984) (footnote omitted). However, the Court will not uphold an agency's interpretation which "contravene[s] or ignore[s] the intent of the legislature or the guiding purpose of the statute." *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986) (citations omitted), *aff'd,* 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987).

■ When reviewing an agency's factual findings, the Court must uphold the agency if its findings are supported by substantial evidence. 19 U.S.C. § 1516a(b)(1)(B) (1988). "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion." *Ceramica Regiomontana,* 10 CIT at 405, 636

F.Supp. at 966 (citations omitted). In applying this standard, the Court affirms agency factual determinations that are reasonable and supported by the record when considered as a whole, even though there may be evidence that detracts from the agency's conclusions. *Atlantic Sugar, Ltd. v. United States,* 2 Fed. Cir. (T) 130, 138, 744 F.2d 1556, 1563 (1984).

## DISCUSSION

### 1. Company–Specific Average Useful Life of Assets Method

In *Usinor Sacilor I,* the Court instructed Commerce to reexamine its use of IRS amortization tables as a basis to measure the duration of countervailable benefits resulting from the non-recurring grants and equity infusions received by Usinor Sacilor. 19 CIT at ——, 893 F.Supp. at 1136–38. The Court directed Commerce to identify what evidence, if any, demonstrates that a fifteen-year amortization period reasonably reflects the duration of the commercial and competitive benefits that the subsidies provided to Usinor Sacilor, or to amend its determination accordingly. *Id.* at ——, 893 F.Supp. at 1137–38.

Pursuant to *Usinor Sacilor I,* Commerce abandoned its use of IRS amortization tables for calculating the duration of benefits associated with the subsidies. Commerce reopened the administrative record in order to request company-specific financial data from Usinor Sacilor. Using Usinor Sacilor's fixed asset ledgers and financial statements, Commerce then calculated the actual average useful life of Usinor Sacilor's renewable physical assets. Commerce determined that the average useful life ("AUL") of Usinor Sacilor's renewable physical assets is fourteen years. *Redetermination* at 24–31.

The Court now addresses two issues with respect to Commerce's findings concerning the duration of countervailable benefits: (1) whether the company-specific AUL method is based on a permissible construction of the statute; and (2) whether substantial evidence supports Commerce's factual finding that the average useful life of Usinor Sacilor's renewable physical assets is fourteen years.

■ The Court notes that the relevant statute is silent as to the duration over which subsidies must be allocated. 19 U.S.C. § 1671. Therefore, the Court must determine whether Commerce's interpretation of the statute is reasonable in light of the legislative intent of the statute. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781.

Commerce justifies its application of a company-specific AUL methodology to measure the duration of benefits from subsidies on the grounds that the focus of the countervailing duty law is on the benefit to production. *See* 19 U.S.C. § 1671(a); *British Steel Corp. v. United States,* 9 CIT 85, 96, 605 F.Supp. 286, 295 (1985). Commerce argues that subsidies confer an advantage on a manufacturing firm because they provide additional capital to increase productive assets.

Usinor Sacilor argues that the AUL methodology does not reasonably reflect the commercial and competitive benefit of nonrecurring subsidies. According to Usinor Sacilor, the benefit of non-recurring subsidies is financial rather than related to the cost of plant or equipment. Subsidies constitute the receipt of money on terms inconsistent with commercial considerations. Hence, according to Usinor Sacilor, the best measure of the benefit received turns on the hypothetical cost of alternative financing obtained on arms-length commercial terms.

In reviewing Commerce's methodology, the Court notes that Commerce has used Usinor Sacilor's proposed alternative ·methodology in past cases, and that it has since rejected it. Absent statutory guidelines regarding the duration of benefits attributable to non-recurring subsidies, Commerce needs a point in time to truncate the allocation of benefits. This allocation must be supported on a rational basis. For this reason, Commerce has rejected plaintiffs' proposed use of an alternative cost of capital figure in order to allocate benefits because of the practical problems associated with accurately calculating the average life of long-term debt. Accurate calculation is difficult because firms do not raise long-term capital routinely or consistently. *Stainless Steel Plate from the United Kingdom,* 51 Fed.Reg. 44,656, 44,658–59 (Dec. 11, 1986). Commerce draws on

*Cold–Rolled Carbon Steel Flat–Rolled Products From Argentina,* 49 Fed.Reg. 18,006, 18,017–18 (Apr. 26, 1984), for support of its proposed methodology. In that case, Commerce utilized a weighted cost of capital approach in order to calculate both the average cost of alternative financing and the duration of this financing. However, even then, Commerce noted the difficulty in collecting accurate data to support the alternative financing approach and warned that, in future cases, it may be forced to change its practice if data is systematically unavailable. *Id.*

Despite its experimentation with different methodologies, Commerce consistently has favored measuring the duration of a subsidy benefit based on the average useful life of a company's renewable physical assets. *See* General Issues Appendix, 58 Fed.Reg. 37,-224, 37,227 (July 9, 1993). When Commerce has calculated the average useful life using company-specific data obtained from annual reports and other financial data, the Court of International Trade has also approved the methodology. *See Ipsco, Inc. v. United States,* 13 CIT 335, 710 F.Supp. 1581 (1989), *aff'd in part, rev'd in part,* 8 Fed. Cir. (T) 80, 88, 899 F.2d 1192, 1198 (1990); *British Steel v. United States,* 20 CIT ——, —— – ——, 929 F.Supp. 426, 433–35 (1996).

As in previous cases, the Court upholds the company-specific AUL methodology as based on a permissible construction of the statute. Commerce has calculated the period of subsidy benefits based on company-specific data. There is a rational link between receiving financial subsidies and the use of these subsidies for improving the productive assets of the company. It is also significant that Commerce has developed expertise with various methods and has determined that the company-specific AUL methodology is the best available option for measuring the duration of subsidy benefits.

■ Having determined that the company-specific AUL methodology is based on a reasonable construction of the statute, the Court now addresses whether substantial evidence on the record supports Commerce's findings under the methodology. In reviewing Commerce's factual determination that a fourteen-year period accurately measures the pe-

riod of the subsidy benefit, the Court must uphold Commerce's finding if it is supported by substantial evidence on the record. 19 U.S.C. § 1516a(b)(1)(B)(i).

In making this determination, the Court recognizes that the average life of plant and equipment is only an estimate of the duration of the benefit received. However, as previously noted, Commerce's calculation is based upon actual financial data provided by Usinor Sacilor. This data is compiled according to Generally Accepted Accounting Principles. *Redetermination* at 29–30. Based upon a review of the record in this case, the Court finds that Commerce's findings that a fourteen-year period accurately measures the benefit of subsidies is supported by substantial evidence.

2. *Exclusion by Commerce of Usinor Sacilor's Non–French Production from the Calculation of the Countervailing Duty*

The Court now addresses whether Commerce's intent plus control test provides a reasonable basis upon which to find that only Usinor Sacilor's French domestic production was likely to benefit from government subsidies under the circumstances of this case. In this case, there is other evidence in the administrative record relevant to the likely economic effects of the subsidies. Thus, the Court reviews whether the intent plus control test is reasonable when its application effectively precludes the consideration of all relevant evidence. Before commencing this analysis, some background on the issue is appropriate.

The countervailable events were debt-to-equity conversions that occurred in 1981, 1986, and 1988 when the French government took an additional equity interest in Usinor Sacilor in exchange for bonds and debt instruments held by the French government, and for prior shareholder advances made by the French government to cover revenue shortfalls.[1] Commerce determined that these debt-to-equity conversions most likely benefitted only French domestic production rather than Usinor Sacilor's worldwide production. Commerce reached this determination based upon evidence showing that the French government intended to benefit only French domestic production and that it possessed control over Usinor Sacilor to effectuate its intent. As a result of its determination that subsidies benefitted only French domestic production, Commerce then calculated a comparatively larger countervailing duty than if it had found that the subsidies benefitted Usinor Sacilor's worldwide production.[2]

In *Usinor Sacilor I,* the Court remanded the case to Commerce because Commerce failed to allow plaintiffs an opportunity to submit evidence demonstrating that the French government's subsidies were likely to benefit Usinor Sacilor's worldwide production. The Court instructed Commerce to provide this opportunity to plaintiffs. *Usinor Sacilor I,* 19 CIT at ——, 893 F.Supp. at 1138–42.

Following this Court's remand, Commerce reopened the administrative record and obtained additional evidence from both Usinor

---

1. The bond and debt instruments at issue are (1) "prêts à caractéristiques spéciales" or "loans with special characteristics" received by Usinor and Sacilor; and (2) "Fonds d'Intervention Sidérurgique" or the "Steel Intervention Fund" through which Usinor and Sacilor were able to issue bonds guaranteed by the French government to the public. The French government also provided shareholder advances between 1982 and 1986 to Usinor and Sacilor, the companies that later combined to form Usinor Sacilor, in order to finance revenue shortfalls.

2. Whether subsidies benefit domestic or worldwide production affects the amount of the countervailing duty imposed upon Usinor Sacilor through the sales denominator. Commerce imposes a per-unit countervailing duty equal to

the per-unit subsidy received by a foreign manufacturer. In calculating the per-unit subsidy received, Commerce divides the value of total subsidies received by Usinor Sacilor by a denominator consisting of the sales of the firm's production. Because Commerce determined that only French domestic production received any benefit from these subsidies, Commerce used the firm's domestic production as the denominator. Usinor Sacilor contends that worldwide production benefitted from these subsidies. Therefore, according to Usinor Sacilor, the total value of subsidies should be divided by a larger denominator comprised of both its domestic and foreign production, thereby reducing the amount of the per-unit countervailable duty.

Sacilor and defendant-intervenor Inland Steel. Commerce then determined that the debt-to-equity conversions provided benefits, in the first instance, directly to Usinor Sacilor, the consolidated company, and not to any particular subsidiaries. *Redetermination* at 15. However, Commerce also found that the only benefit to worldwide production consisted of accounting adjustments to the consolidated losses of Usinor Sacilor. Commerce concluded that the elimination of consolidated losses did not show that the likely uses or effects of the debt-to-equity conversions were to benefit foreign production. *Id.* at 16.

Ultimately, Commerce determined that the subsidies would likely benefit only French domestic production. As in its *Initial Determination*, Commerce based this conclusion in the *Redetermination* upon evidence that the French government intended to aid French domestic production as part of their economic and social policy, and that the French government had sufficient control over Usinor Sacilor to effectuate its intent. *Redetermination* at 17–22.

The statute does not provide a particular method for Commerce to use when it determines what portion of a firm's production is relevant in order to calculate the countervailing duty. 19 U.S.C. § 1671. Commerce therefore promulgated its own method.[3] In the absence of statutory law specifically addressing the method of calculating the amount of the subsidy, this Court must assess the reasonableness of Commerce's methodology in light of legislative intent. *Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2781–83. The legislative history reflects Congress' intent that Commerce ascertain which products are likely to have benefited from countervailable subsidies when it determines how it will allocate the value of such subsidies. *See* S.Rep. No. 96–249, at 85 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 471 ("Reasonable methods of allocating the value of ... subsidies over the production or exportation of the products benefitting from the subsidy must be used."); H.R.Rep. No. 96–317, at 75 (1979) ("[I]n calculating the *ad valorem* effect of non-recurring subsidy

grants or loans, reasonable methods of allocating the value of such subsidies over the production or exportation of products benefitting from them will be used.").

In *Usinor Sacilor I*, the Court refrained from passing on Commerce's intent plus control test pending remand. At that time, the Court merely stated that the intent plus control test *may* provide a reasonable basis for Commerce's determination. 19 CIT at ——, 893 F.Supp. at 1141.

■ However, the Court in *Usinor Sacilor I* further instructed the parties that economic considerations should guide the determination of whether a subsidy likely benefits domestic or worldwide production. This is in accordance with prior cases on subsidies. *United States v. Zenith Radio Corp.*, 64 C.C.P.A. 130, 138–39, 562 F.2d 1209, 1216 (1977) ("it is the economic result of the foreign government's action which controls"), *aff'd*, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978). Commerce is to look at the competitive advantage that the subsidy creates. *British Steel*, 9 CIT at 95, 605 F.Supp. at 294 (citing *G. S. Nicholas & Co. v. United States*, 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919); *Downs v. United States*, 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275 (1903)).

Accordingly, Usinor Sacilor argues that the countervailing duty law is concerned with the commercial and competitive benefit of subsidies, not with government purpose or intent. In Usinor Sacilor's view, only the competitive benefits that are a direct consequence of subsidies should be considered in determining the appropriate amount of the duty.

■ The Court notes that in administering the countervailing duty law, Commerce does not ascertain the actual economic impact of a subsidy on the competitiveness of a firm's production. Nor has this Court or the Federal Circuit required Commerce to do so because it is neither practicable nor required by statute that Commerce "trace uses" of subsidies. *Saarstahl AG v. United States*, —— Fed. Cir. (T) ——, 78 F.3d 1539, 1543

---

3. *See* note 2 and accompanying text for an explanation of Commerce's method for considering an

appropriate portion of a firm's production in the calculation of countervailing duties.

(1996); *British Steel*, 20 CIT at ——, 929 F.Supp. at 456.

Rather, Commerce looks to the likely effect of subsidies as a substitute for actual economic effect. In 1993, Commerce enumerated the types of evidence that it considers to be relevant when it determines the likely effect of subsidies. General Issues Appendix, 58 Fed.Reg. at 37,231. Pursuant to its current methodology, Commerce considers intent and control in addition to other factors, including the nature of the program, communication between the government and the subsidy recipient in relation to the subsidy, and any other evidence addressing the likely beneficiaries of the subsidy. In the present case, however, Commerce relied only upon the intent and control of the French government as the basis of its determination. *Redetermination* at 17–22.

■ The Court now rules on whether the intent plus control factors, without further analysis by Commerce, provide a reasonable basis upon which to find that only domestic industry was likely to benefit from the subsidies when there is other evidence in the administrative record relevant to the likely economic effects of the subsidies.

Usinor Sacilor has demonstrated that there is evidence in the administrative record that the parent company provided substantial financial support to non-French production operations during the years that the subsidies at issue were provided by the French government. In particular, there is evidence that Usinor Sacilor acquired interests in production facilities and provided financial support to existing subsidiaries located outside of France. Based upon Usinor Sacilor's supplemental briefs, the amount of funds that Usinor Sacilor transferred abroad constituted a substantial percentage of the total subsidies received.[4] Significantly, the 1978 to 1988 time period during which Usinor Sacilor received subsidies reasonably corresponds to the 1981 to 1991 time period during which the transfers at issue were made. This supports Usinor Sacilor's contention that the subsidies funded transfers to the firm's worldwide production facilities. The financial evidence provided by Usinor Sacilor was derived from statements from auditors, data from annual reports, and minutes from various Usinor Sacilor board meetings. It is clear from Commerce's *Redetermination,* statements made by Commerce at oral argument, and statements made in their briefs that the Commerce Department did not consider this evidence, but rather elected to rely exclusively on the intent plus control factors in making its determination. *Redetermination* at 17–22.

The Court finds that it is unreasonable for Commerce to look only to the intent of the French government and its control over the state-owned firm when there is other economic evidence in the administrative record that Commerce easily could have considered. In keeping with Congress's intent, Commerce should have considered all relevant evidence that was practicable in making its determination. Thus, applying a methodology that excludes relevant evidence that is not unduly burdensome to consider is unreasonable.

Accordingly, the Court remands this case to Commerce with instructions to examine the distribution of subsidies among Usinor Sacilor's multinational production operations. If Commerce determines that a substantial portion of the subsidies were transferred outside France, Commerce should address how this should be reflected when it calculates the countervailing duty. The Court recognizes that Commerce may adopt various methods to conduct this analysis.

---

**4.** According to the figures provided by Usinor Sacilor in its supplemental brief, the Court estimates that Usinor Sacilor transferred approximately 14–17% of the subsidies that it received from the French government to its non-French subsidiaries. The Court's calculation is admittedly rough. It is based upon exchange rate conversions performed by Usinor Sacilor. Also, the Court has not discounted the cash flows to Usinor Sacilor from the French government and to Usinor Sacilor's non-French subsidiaries back to any particular point in time in making this calculation. Commerce is the appropriate body to make these kinds of adjustments to the data and to weigh the data appropriately. The Court's calculation is solely for the purpose of determining whether Usinor Sacilor has presented evidence which substantially undermines Commerce's conclusion.

It is important to note the effect of today's ruling. Unlike in *British Steel*, 20 CIT at ——–——, 929 F.Supp. at 453–57, this Court finds that Usinor Sacilor has presented evidence sufficient to require Commerce to consider economic evidence beyond mere intent plus control. This holding does not disturb the reasonableness of the intent plus control test when no evidence is presented to effectively rebut the conclusion reached on the basis of the test.

Today's ruling, in keeping with Commerce's "likely effects" inquiry, merely stands for the proposition that when economic evidence is present in the administrative record pertaining to the likely effects of a subsidy, Commerce must utilize a methodology that permits consideration of that evidence. Thus, this ruling does not require Commerce to determine the actual effect of subsidies. Under this decision, Commerce continues to ascertain the "likely effects" of subsidies as a proxy for actual economic effects. In implementing today's ruling, Commerce should review distributions of capital from the parent to the subsidiary at the time of the distributions to the subsidiary. No further analysis is required. Evidence of the distribution informs Commerce of the likely effects of the subsidies. This is practicable. It is analogous to Commerce's current practice of reviewing distributions from the government to the parent company at the time of distribution to the parent company.

Importantly, today's ruling does not require Commerce to "trace" the subsidy. "Tracing" as it is commonly understood means to track the subsidy to a particular end-use or allocation in order to determine its actual effect. "Tracing" is impracticable because it would require Commerce to follow the expenditure of the subsidy within the foreign subsidiary after it is transferred from the parent company. A "tracing" requirement would be burdensome and contrary to legislative intent because it would undermine the effective enforcement of the countervailing duty law. North American Free Trade Agreement Implementation Act, S.Rep. No. 103–189, at 42 (1993) ("[a]n 'effects' test for subsidies has never been mandated by the law and is inconsistent with effective enforce-

ment of the countervailing duty law."); *Saarstahl*, 78 F.3d at 1543. Today's ruling does not impose a "tracing" requirement because it does not require Commerce to monitor the subsidy after it has been transferred by the parent to the foreign subsidiary.

▪ In conclusion, intent plus control alone is not a reasonable method for Commerce to base its likely effects determination when (1) there is direct economic evidence in the administrative record regarding the likely effects of subsidies, and (2) that evidence is not burdensome to consider. To conclude otherwise would have the effect of excluding significant evidence relevant to Commerce's likely effects determination.

### 3. Specificity of Crédit National Loans to the Steel Industry

In *Usinor Sacilor I*, the Court remanded Commerce's determination with respect to its analysis of the specificity of loans made by Crédit National. In 1991, Crédit National consolidated these loans with new terms and conditions. In its *Initial Determination*, Commerce analyzed Crédit National's lending practices and portfolio based on the period of the 1991 consolidation, determined that the loans were non-specific to the French steel industry, and therefore found them not countervailable. In *Usinor Sacilor I*, the Court instructed Commerce to analyze the loan distribution at the time the loans were issued, or to articulate why it analyzed the loans based on the consolidation period. 19 CIT at ——, 893 F.Supp. at 1146.

Following this Court's remand, Commerce concluded that it erred in its prior analysis. Commerce determined that it is appropriate to consider loan specificity based on the time period during which the loans were issued because the terms of the original loans remained in effect during the period of investigation—the 1991 calendar year. Accordingly, Commerce reopened the administrative record and requested information regarding whether Crédit National made loans during that time period that were limited in fact to a specific enterprise, industry, or group. In response, Usinor Sacilor provided information from annual reports describing the distribution of its loans from 1979 to 1989, a

period covering the issuance of the loans in question. The same data was submitted to Commerce and verified in *Certain Steel Products from France,* 58 Fed.Reg. 37,304, 37,311 (July 9, 1993).

Based upon the information provided by Usinor Sacilor, Commerce determined that the Crédit National loans made during the time period prior to the loan consolidation were provided to numerous sectors of the French economy and were not disproportionately provided to the steel industry. *Redetermination* at 31–34. Other industries that received Crédit National loans included agriculture, metallurgy, energy and chemical, and textiles and clothing. *Id.*

The Court now addresses defendant-intervenor Inland Steel's challenges to the methodology used by Commerce to analyze the specificity of the loans.

First, Inland Steel contends that Commerce erred when it did not assess the specificity of the loans on a program-by-program basis. According to Inland Steel, Commerce has analyzed Crédit National loan programs separately in past cases. In *Brass Sheet and Strip from France,* 52 Fed.Reg. 1,218, 1,221 (Jan. 12, 1987), Commerce determined that different loans of Crédit National constituted different programs and analyzed each of them for specificity separately. Alternatively, Inland Steel contends that Commerce erred by failing to state its rationale for changing its practice in the present case. *See Secretary of Agric. v. United States,* 347 U.S. 645, 74 S.Ct. 826, 98 L.Ed. 1015 (1954); *Citrosuco Paulista, S.A. v. United States,* 12 CIT 1196, 1209, 704 F.Supp. 1075, 1088 (1988) (noting the general rule that an agency must either conform itself to prior decisions or explain its departure).

Inland Steel's arguments lack merit. Commerce's decision to analyze the entire portfolio is a reasonable method to determine whether Crédit National made loans to a specific enterprise or industry. It is common for a large bank to have specialized programs for particular industries to aid it in assessing whether it should enter into a loan with a particular firm. This does not prove that the bank is attempting to benefit a particular industry. Rather, specialized programs al-

low banks to more efficiently collect information and to analyze credit risk relevant to particular industries.

Although Commerce has analyzed loan programs separately in other cases, it has remained consistent throughout this particular case by analyzing Crédit National's entire loan portfolio. *Initial Determination,* 58 Fed.Reg. at 6,226–27. Furthermore, Inland Steel's reliance on *Brass Sheet and Strip from France* is misplaced. In that case, Commerce analyzed individual loan programs which involved "procedural loans" made on behalf of the French government with terms set by the government. 52 Fed.Reg. at 1,221. This is inapposite to the present case because the loans at issue today were made as part of Crédit National's ordinary lending practice. *Brass Sheet and Strip from France,* therefore, does not support Inland Steel's contention that Commerce erred by failing to individually analyze the loan programs in the present case.

With respect to Commerce's method of analyzing the loans, the Court finds that Commerce followed the instructions of this Court as set forth in *Usinor Sacilor I,* 19 CIT at ——, 893 F.Supp. at 1146, and that the method adopted was reasonable.

With respect to Commerce's factual findings, the Court finds that Commerce's analysis of the facts are supported by substantial evidence in the record. 19 U.S.C. § 1516a(b)(1)(B). Commerce has established that it has appropriately considered the distribution of the original loans under the terms in effect during the period of investigation. Commerce has shown that Crédit National made loans to various industries and that Crédit National's portfolio reflects that it did not make these loans disproportionately to the steel industry. *Redetermination* at 31–34. Accordingly, the Court affirms Commerce's determination with respect to the specificity of Crédit National loans.

## CONCLUSION

Upon consideration of all of the parties' arguments and submissions, the Court holds that Commerce's *Redetermination* is af-

firmed with respect to Commerce's findings concerning the company-specific average useful life of assets and the specificity of Crédit National loans. Commerce's *Redetermination* is remanded with respect to its analysis of evidence on the likely effects of subsidies in calculating the amount of the countervailing duty. The Court's order will be entered accordingly.

### ORDER

This action having been submitted for decision; and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is hereby

ORDERED that the *Final Results of Redetermination Pursuant to Court Remand* (October 24, 1995) ("*Redetermination*") of the U.S. Department of Commerce, International Trade Administration, are sustained with regard to Commerce's determination that: (1) the Crédit National loans were not specific to the steel industry; and (2) the amortization period for the non-recurring grants and equity infusions that Usinor Sacilor received is fourteen years; it is further

ORDERED that Commerce's *Redetermination* is remanded for reconsideration in accordance with the Court's *Memorandum and Opinion* concerning the sales denominator used in computing Usinor Sacilor's net subsidy; it is further

ORDERED that Commerce's remand results are due to be filed within sixty (60) days from the date of this *ORDER*. Any comments or responses by the parties to the remand results are due on or before thirty (30) days thereafter, and shall be limited to twenty (20) pages. Any rebuttal comments are due twenty (20) days thereafter, and shall be limited to twenty (20) pages.