**Slip-Op. 01-68**

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____ :
                                          :

**FABRIQUE DE FER**
**DE CHARLEROI, SA,**            :

               :

               **Plaintiff,**       :

               :

               v.                 :            **Court No. 99-04-00219**

               :            **BEFORE:  CARMAN, CHIEF JUDGE**

**UNITED STATES OF AMERICA,**       :

               :

               **Defendant,**       :

               :

               **and**               :

               :

**U.S. STEEL GROUP, A UNIT OF USX**    :
**CORPORATION AND BETHLEHEM**    :
**STEEL CORPORATION,**            :

               :

               **Defendant-**       :
               **Intervenors.**      :
_____:

[Plaintiff's motion for judgment upon the agency record is denied.]

                                            Date: June 6, 2001

*Barnes, Richardson & Colburn* (*Gunter von Conrad* and *Michael J. Chessler*), Washington, D.C., for plaintiff.

*Stuart E. Schiffer*, Acting Assistant Attorney General of the United States; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Michele D. Lynch*, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Myles S. Getlan*, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Counsel, for defendant.

*Dewey Ballantine LLP* (*John A. Ragosta, Jennifer Danner Riccardi, and Hui Yu*), Washington, D.C., for defendant-intervenors.

**OPINION**

**CARMAN, CHIEF JUDGE:** Plaintiff, Fabrique de Fer de Charleroi, S.A. (Fafer), a Belgian manufacturer/exporter of cut-to-length carbon steel plate, moves for judgment upon the agency record challenging the United States Department of Commerce's (Commerce) final results and amended final results of the 1996 countervailing duty administrative review of cut-to-length carbon steel plate from Belgium. *See Certain Cut-to-Length Carbon Steel Plate From Belgium; Final Results of Countervailing Duty Administrative Review*, 64 Fed. Reg. 12,982 (March 16, 1999) (*Final Results*); *Cut-to-Length Carbon Steel Plate From Belgium; Amended Final Results of Countervailing Duty Administrative Review*, 64 Fed. Reg. 18,001 (April 13, 1999) (*Amended Final Results*). In the *Final Results*, Commerce found a *de minimis* countervailing duty margin of 0.35% based on Fafer's subsidies as well as subsidies of two affiliated companies, S.A. Charleroi Deroulage (CD) and Parachevement at Finitions de Metaux (PFM). The subsidies derived from Belgium's Economic Expansion Law of December 30, 1970, a program found countervailable in the original countervailing duty investigation. *See Final Results*, 64 Fed. Reg. at 12,991, 12,993. In the *Amended Final Results*, Commerce claimed it made a ministerial error in the *Final Results* by failing to apply the 0.5% test[1] to subsidies received by PFM. Applying the test, Commerce found the grants were less than 0.5% of the total sales and expensed the grant. Commerce then amended Fafer's CVD margin to 0.69% *ad valorem*, subjecting Fafer to countervailing duties. *Amended Final Results*, 64 Fed. Reg. at 18,002-003. Plaintiff asks this

---

[1] Under the regulation, all grants which are less than 0.5% of the relevant sales of the firm (e.g., total sales, export sales) for the year in which the subsidies are approved are considered nominal grants that will normally be expensed in the year in which the benefit was received rather than amortized. *See* 19 C.F.R. § 351.524(b) (1999).

Court (1) to vacate the *Amended Final Results*; (2) to instruct Commerce to recalculate Fafer's

countervailing duty margin to exclude any alleged subsidies made to affiliated companies or,

alternatively, to instruct Commerce to reinstate the allocation methodology used in the *Final*

*Results* (amortization); and (3) to instruct Commerce to have Customs apply a zero

countervailing duty rate to the subject merchandise.

Defendant, United States, and Defendant-Intervenors, U.S. Steel Group, a Unit of USX

Corporation and Bethlehem Steel Corporation, (collectively "Defendants"), oppose Plaintiff's

motion arguing Commerce's decision to include subsidies received by two of Fafer's subsidiaries

in its calculation of the countervailing duty margin is supported by substantial evidence and is

otherwise in accordance with law.  Defendants also argue that Commerce's decision to amend

the countervailing duty margin based on ministerial error is supported by substantial evidence

and is otherwise in accordance with law.  The Court has jurisdiction pursuant to 28 U.S.C. §

1581(c) (1994).

## I.  BACKGROUND

On August 17, 1993, Commerce issued a countervailing duty order on cut-to-length

carbon steel plate from Belgium to which Plaintiff was subject.  *See Countervailing Duty Order*

*and Amendment to Final Affirmative Countervailing Duty Determination:  Certain Steel*

*Products From Belgium*, 58 Fed. Reg. 43,749 (Aug. 17, 1993) (*CVD Order*).  On September 25,

1997, Commerce initiated an administrative review of the *CVD Order* pursuant to requests by

Plaintiff and Petitioners.[2]  This review covered imports of subject merchandise entered into the

_____

[2] Petitioners and Defendant-Intervenors are the same parties in this case.

United States during the period of January 1, 1996 through December 31, 1996.

Commerce asked Plaintiff to submit information regarding any subsidies it may have received during the period of review.  In response to a supplemental questionnaire issued by Commerce, Plaintiff indicated that two of its subsidiaries, S.A. Charleroi Deroulage (CD) and Parachevement et Finitions de Metaux (PFM), had received grants subsequent to the publication of the *CVD Order*.  (Defendant's Exhibit 1 (Def.'s Exh.) at S-8.)  Specifically, Plaintiff indicated (1) CD received a grant in March 1993 for investment in an uncoiling machine, and (2) PFM received a grant in May 1996 for investment in a painting machine and an uncoiling machine.  (Id.)  On September 9, 1998, Commerce published the preliminary results of the countervailing duty administrative review.  *See Cut-to-Length Carbon Steel Plate From Belgium; Preliminary Results of Countervailing Duty Review*, 63 Fed. Reg. 48,188 (Sep. 9, 1998) (*Preliminary Results*).  Commerce found a *de minimis* CVD margin of 0.37 percent *ad valorem* based on subsidies received by Fafer under Belgium's Economic Expansion Law of December 30, 1970. *Id*. at 48,191.  Commerce did not countervail the cash grants received by CD or PFM and did not provide an explanation for this decision.  *Id*.

Subsequent to the issuance of the *Preliminary Results*, interested parties were authorized to submit written comments pursuant to 19 C.F.R. § 351.309 (1998).  Petitioners submitted comments arguing that Commerce must countervail the cash grants to CD and PFM if the equipment purchased with the grants could be used to process subject merchandise, even if the equipment was not used to process subject merchandise imported during period of review. (*Petitioners' October 8, 1998 Administrative Brief*, Def.'s Exh. 6 at 28.) (emphasis in original).

Plaintiff responded by arguing that Commerce could only countervail the grants to CD and PFM if the "subject merchandise <u>exported to the United States, and imported into the United States</u> underwent or benefitted from uncoiling, painting, or sandblasting operations." (*Plaintiff's February 12, 1999 Rebuttal Comments*, Def.'s Exh. 7 at 3.) (emphasis in original). In November 1998, Commerce conducted verification at Fafer's facilities in Belgium. *See Final Results*, 64 Fed. Reg. at 12,983.

Based on comments received from interested parties, and upon request by Petitioners, Commerce held a public hearing on February 19, 1999 on the issue of whether CD's and PFM's facilities could be used to process the subject merchandise. *Id.* During the hearing Plaintiff suggested that CD and PFM are capable of producing merchandise subject to the scope of the order, albeit "[a] different and downstream cut-to-length plate in a much thinner format." (Def.'s Exh. 8, at 56, *Public Hearing Transcript dated February 19, 1999.*) Additionally, when asked if the merchandise that goes through PFM's process of unrolling, cutting and slitting coil produced by Fafer "would fit within the scope of this review," Fafer stated, "[w]ell, yes, well actually as the verification report correctly states, I think they're doing these things for Fafer . . ." (Id. at 63.)

On March 16, 1999 Commerce issued the *Final Results* of the countervailing duty administrative review, making two determinations relevant to the instant case. *See Final Results*, 64 Fed. Reg. at 12,982. First, Commerce determined that "[o]n the basis of the fact that CD and PFM can, in their down-stream processing, produce merchandise which is covered by the scope of the [countervailing duty] order, . . . the cash grants under the Law of 1970, a program previously found countervailable by the Department, are attributable to the total sales of Fafer, including its subsidiaries and thus benefitted the subject merchandise during the [period of

review].” *Id*. at 12,984.  Second, Commerce calculated the benefit for the CD and PFM grants by

“employ[ing] the standard grant methodology outlined in the allocation section of the GIA (FR

37227). [Commerce] allocated the benefit from each grant received by CD and PFM over 26

years, Fafer’s AUL [i.e., average useful life of fixed assets].” *Id*.  Commerce calculated a *de*

*minimis* net subsidy rate of 0.35 percent *ad valorem*.  *Id*.

Subsequent to the issuance of the *Final Results*, Petitioners submitted a letter to

Commerce alleging that Commerce had made a ministerial error in the calculation of the

countervailing duty margin.  (Def.’s Exh. 9, at 4, *Petitioners’ March 16, 1999 Ministerial Errors*

*Letter*.)  Petitioners argued that while Commerce indicated its intent to utilize the standard grant

methodology outlined in the General Issues Appendix (GIA) to calculate the CVD margin, it

failed to follow the GIA’s rules regarding when a grant is amortized and when a grant is

expensed in the year of receipt.  (Id. at 2-4.)  Specifically, Petitioners asserted Commerce should

have used the so-called “0.5 percent test”.   Petitioners contended the test mandates the

expensing of non-recurring grants[3] if the sum of grants provided under a particular program in a

given year is less than 0.5 percent of a firm’s total or export sales in the year in which the grant

was received.  (Id. at 3-4.)

Plaintiff then rebutted Petitioners’ allegations, claiming Commerce had discretion over

---

[3] Grants are considered “non-recurring” when the benefits are exceptional, the recipient
cannot expect to receive benefits on an ongoing basis from review period to review period and/or
the provision of funds by the government must be approved every year. *See General Issues*
*Appendix*, 58 Fed. Reg. 37,217, 37,226 (July 9, 1993) (*GIA*), *appended to Certain Steel Products*
*from Austria*, 58 Fed. Reg. 37,217 (July 9, 1993).  By contrast, “recurring” benefits are those
which a firm receives, or is likely to receive, on an ongoing basis from review period to review
period. *Id*.  “Expensing” may be defined as assigning the entire value of the grant to the year of
receipt.

whether to apply the "0.5 percent test".  Because of this discretion, Plaintiff argued, the alleged

error was methodological, not ministerial pursuant to 19 C.F.R. § 351.224 (1998).[4]  Plaintiff

urged Commerce to reject Petitioners allegation and retain the original countervailing duty

margin.  (Def.'s Exh. 10, at 2, *Fafer March 22, 1999 Response to Ministerial Errors Letter*.)

After reviewing the comments submitted by the parties, Commerce issued its *Amended

Final Results* on April 13, 1999.  *See Amended Final Results*, 64 Fed. Reg. at 18,001.

Commerce agreed with Petitioners that it made a ministerial error by not applying the 0.5 percent

test to the grants.  *Id*. at 18,002.  Accordingly, Commerce applied the test, thus changing the net

subsidy rate to 0.69 percent *ad valorem*, a rate above *de minimis*.  *Id*. at 18,002-03.

Plaintiff then timely commenced this action on April 15, 1999.

## II.  STANDARD OF REVIEW

This Court must sustain an administrative countervailing duty determination unless it is

"unsupported by substantial evidence on the record, or otherwise not in accordance with law."

19 U.S.C. § 1516a(b)(1)(B) (1994).  Substantial evidence is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *Matsushita Elec. Indus. Co.,

Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consolidated Edison Co. v.

NLRB*, 305 U.S. 197, 229 (1938)).  In determining whether Commerce's interpretation and

application of the countervailing duty statute is in accordance with law, the Court must consider

---

[4] 19 C.F.R. § 351.224 defines ministerial error as "an error in addition, subtraction, or
other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the
like, and any other similar type of unintentional error which the Secretary considers ministerial."

whether the statute addresses the specific question at issue, and if not, whether the agency's

interpretation of the statute is reasonable.  *See Chevron U.S.A. Inc. v. Natural Resources Defense*

*Council, Inc.*, 467 U.S. 837, 842-43 (1984).  This Court must accord considerable weight to

Commerce's construction of the countervailing duty statute.  *See E.I. Du Pont De Nemours &*

*Co. v. United States*, 8 F. Supp.2d 854, 858 (Ct. Int'l Trade 1998).

III.  DISCUSSION

Plaintiff's challenge to Commerce's *Final* and *Amended Final Results* raises three issues:

(1) whether Commerce's determination that grants to Plaintiff's subsidiaries, PFM and CD, were

countervailable, is supported by substantial evidence on the record and otherwise in accordance

with law; (2) whether Commerce's decision to apply its 0.50 percent test and expense the grants

to CD and PFM in the year of receipt in the *Amended Final Results* was supported by substantial

evidence on the record and otherwise in accordance with law; and (3) whether Commerce's

characterization of its error in not applying the 0.50 percent test in the *Final Results* as

ministerial is supported by substantial evidence and otherwise in accordance with law.

**A.      Commerce's Determination That Grants to Plaintiff's Subsidiaries, PFM and CD,
         Were Countervailable, is Supported by Substantial Evidence on the Record and
         Otherwise in Accordance With Law**

1.      Contentions of the Parties

(a)     *Plaintiff*

Plaintiff makes three arguments.  First, Plaintiff argues Commerce's inclusion of

subsidies to affiliated companies in Plaintiff's countervailing duty margin is not supported by

substantial evidence on the record or otherwise in accordance with law where the affiliated companies were not involved in the manufacture, production, exportation, or sale of the merchandise subject to the administrative review at issue. Second, Plaintiff argues that the countervailing duty statute precludes the imposition of countervailing duties on the subsidies given to CD and PFM. The statute states countervailing duties will be imposed if Commerce "determines that the government of a country or any public entity . . . is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation into the United States," 19 U.S.C. § 1671(a)(1) (1999). Plaintiff urges this language should be construed to require that duties be imposed only when the company receiving the subsidies "manufactures, produces, or exports" subject merchandise that was actually imported into the United States. (Brief in Support of Plaintiff's Motion for Summary Judgment (Pl.'s Br.) at 9.)

Plaintiff maintains that neither CD nor PFM have ever or will ever produce the subject merchandise. (Id. at 8.) Therefore, since the merchandise under review was not "manufactured, produced, or exported" by either subsidiary, no countervailing duty can be imposed based on the subsidies to those companies. (Id. at 9.)

Third, Plaintiff rejects Commerce's argument that Plaintiff's approach would require Commerce to "examine specific sales from subsidized subsidiaries that are capable of producing subject merchandise, to determine, on a sale by sale basis, whether the merchandise exported to the U.S. 'passed through' the subsidiary." *Final Results*, 64 Fed. Reg. at 12,990. Plaintiff claims to understand the administrative burden that would be imposed on Commerce if it was required to track production of these export sales, but argues that in this case no such burden exists

because there was only one sale of subject merchandise to the United States during the period of review. (Pl.'s Br. at 12.) Plaintiff argues Commerce should be required to examine the facts of the individual case when the administrative burden is low. (Id.) Plaintiff concludes Commerce cannot attribute the alleged subsidies to CD and PFM in its countervailing duty margin when the subsidiaries are not involved in the "manufacture, production, or exportation" of the merchandise imported into the United States which is subject to the administrative review. (Id.)


        (b)     *Defendant*

Defendant maintains Commerce's decision to countervail the grants given to CD and PFM is supported by substantial evidence and is otherwise in accordance with law.

Defendant argues it is Commerce's practice to attribute subsidies received by one company to the sales of another related company that also produces the subject merchandise. (Memorandum of the United States in Opposition to the Plaintiff's Motion for Judgment Upon the Administrative Record (Def.'s Br.) at 11.) Defendant contends CD and PFM, as Plaintiff's subsidiaries and, thus, related companies, received grants under the Law of 1970 that aid in the production of the subject merchandise. Therefore, Commerce's decision to countervail those subsidies in Plaintiff's countervailing duty margin was consistent with that practice.

Defendant points out Plaintiff does not dispute that its subsidiaries, CD and PFM, received subsidies. Nor does Fafer dispute that the subsidiaries are able to produce subject merchandise. Defendant claims Commerce carefully examined this issue during the administrative review and properly found that the subsidiaries are capable of producing merchandise that is subject to the scope of the countervailing duty order. (Id. at 13.) Based on

this record evidence, Defendant contends Commerce properly determined that Plaintiff received subsidies with respect to the manufacture, production, or export of subject merchandise. (Id. at 14.)

Defendant claims Plaintiff does not refute any of the factual findings made by Commerce during the course of the administrative review. According to Defendant, Plaintiff instead argues that the statute "precludes Commerce from countervailing subsidies when the specific merchandise exported to the United States during the period of review did not benefit from those subsidies." (Id. at 15.) Defendant interprets this argument to mean Commerce must examine the use or effects of the subsidy once bestowed. (Id.)

Defendant argues that the governing statute, 19 U.S.C. § 1671(a)(1) (1995), does not require Commerce "to consider the use to which the subsidies are put or their effect on the recipient's subsequent performance . . . ." *Final Results* at 12,991, *quoting GIA*, 58 Fed. Reg. at 37,260. Rather, so long as a subsidy is provided with respect to the manufacture, production or sale of subject merchandise, Commerce may impose countervailing duties. (Def.'s Br. at 16.)

Defendant argues there are important policy reasons supporting Commerce's practice of not examining the "use" or "effects" of the subsidies once bestowed. Defendant contends it is administratively impractical for Commerce to examine whether the subject merchandise "passed through" the subsidiary for every particular sale. Furthermore, Plaintiff has provided no compelling reasons for Commerce to abandon their practice of not examining the use or effects of a subsidy. (Def.'s Br. at 17.)

       (c)     *Defendant-Intervenors*

Because the Court finds Defendant-Intervenors' arguments in this matter substantially similar to those presented by the Defendant, the Court will not recount them in this opinion, although they have been duly considered.

2.      Analysis

In an administrative review of a countervailing duty order, Commerce is required to "review and determine the amount of any net countervailable subsidy." 19 U.S.C. § 1675(a)(1)(A) (1994). During the administrative review at issue in this case, Commerce had to determine whether subsidies conferred upon Fafer's subsidiaries, CD and PFM, under Belgium's Economic Expansion Law of December 30, 1970, should be included in Fafer's net countervailable subsidy. In order to make that determination, Commerce looked to its attribution principles. Commerce's practice during the period of review was to attribute subsidies received by one company to the total sales of a related company.[5] *See Final Results*, 64 Fed. Reg. at 12,984.

Commerce explains, in its final rule on countervailing duties, that "[t]he underlying rationale for attributing subsidies between two separate corporations [with cross-ownership] is that the interests of those two corporations have merged to such a degree that one corporation can

---

[5] This practice was subsequently codified in Commerce's regulation, 19 C.F.R. § 351.525(b)(6)(ii) (1999), which reads, in pertinent part:

> If two (or more) corporations with cross-ownership produce the subject merchandise, the Secretary will attribute the subsidies received by either or both corporations to the products produced by both corporations.

This regulation was not in effect during the administrative review at issue.

use or direct the individual assets (or subsidy benefits) of the other corporation in essentially the same ways it can use its own assets (or subsidy benefits)." *Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348, 65,401 (Nov. 25, 1998). Commerce chose to focus on cross-ownership in attribution decisions because it believed it is reasonable to presume that subsidies granted to one corporation may also benefit the related corporation. *See Countervailing Duties; Proposed Rule*, 62 Fed. Reg. 8,818, 8,845 (Feb. 26, 1997). The Court finds Commerce's decision to attribute the subsidies received by CD and PFM to the total sales of the Plaintiff in accordance with the purpose and rationale of this stated practice. As the Court demonstrates below, the Plaintiff was in a position to use or direct the subsidy benefits received by its subsidiaries in essentially the same way it could use or direct the subsidy benefits had it directly received the subsidies.

The primary consideration in attributing subsidies between two corporations is the level of control, or cross-ownership, existing between the corporations. Cross-ownership, as defined by Commerce, "will exist where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporations." *Countervailing Duties; Final Rule*, 63 Fed. Reg. at 65,401. Cross-ownership clearly exists here. CD and PFM are almost wholly-owned by the Plaintiff, with Plaintiff holding 99.99% of the rights in PFM and 93.75% of the rights in CD. (Appendix to Domestic Producers' Brief in Opposition to Plaintiff's Rule 56.2 Motion (Def.-Intvr.'s App.) at Att. 1, *Letter from Barnes, Richardson, & Colburn to the U.S. Department of Commerce*, App. 5B, at C10/01-02 (Jan. 26, 1998)) CD and PFM are also fully consolidated on Plaintiff's financial statement. (Def.-Intvrs.' App. at Att. 2, *Letter from Barnes, Richardson, & Colburn to the U.S. Department of Commerce*, App. S-5, at 4-5 (May 20, 1998)) Additionally, CD and PFM are physically located within Plaintiff's production

facilities.  *See Fafer Verification Report* at 6.

The next consideration for the purpose of determining if attribution is applicable is whether CD and PFM have the ability to manufacture the subject merchandise.  The term "'subject merchandise' means the class or kind of merchandise that is within the scope of an . . . order under this subtitle [IV – Countervailing and Antidumping Duties]."  19 U.S.C. § 1677(25) (1998).  The subject merchandise at issue here is "cut-to-length carbon steel plates" including (1) hot-rolled carbon steel universal mill plates (i.e., of a width "exceeding 150 millimeters but not exceeding 1,250 millimeters" and a thickness of "not less than 4 millimeters") of a rectangular shape, "whether or not painted, varnished, or coated with plastics or other nonmetallic substances"; and (2) hot-rolled carbon steel flat-rolled products in straight lengths, of rectangular shape, hot rolled, "whether or not painted, varnished, or coated with plastics or other nonmetallic substances, 4.75 millimeters or more in thickness and of a width which exceeds 150 millimeters and measures at least twice the thickness."  *CVD Order*, 58 Fed. Reg. 43,749-50.

The Plaintiff claims CD and PFM do not produce subject merchandise.  It is immaterial whether CD and PFM actually produce the subject merchandise.  The benefits received by CD and PFM were tied to the subject merchandise, so actual production is not required.  In the GIA, Commerce stated its position that "[i]n conducting its traditional 'tied' analysis when a domestic subsidy allegedly is tied to a particular product, the Department will examine what the likely effect of the subsidy would be.  The Department will not try to determine the actual effect of the subsidy, either in the period of investigation or at any time after the subsidy's bestowal."  58 Fed. Reg. at 37232.  "Whenever we allocate a benefit tied to a product under investigation only to that product, there is an implicit assumption that the benefit is intended to affect only that product."

*Id*. Under the traditional tying analysis conducted by Commerce, if "the Secretary determines that a countervailable benefit is tied to the production or sale of a particular product or products, the Secretary will allocate the benefit solely to that product or products." *Countervailing Duties;Proposed Regulations*, 54 Fed. Reg. 23,365, 23,383 (May 31, 1989); *see also Usinor Sacilor v. United States*, 893 F. Supp. 1112, 1138 (Ct. Int'l Trade 1995). On the other hand, "[i]f the Secretary determines that a countervailable benefit is tied to a product other than the merchandise, the Secretary will not find a countervailable subsidy on the merchandise." 54 Fed. Reg. at 23,383.

Here, Commerce verified that PFM received grants for "sheet metal finishing and painting" and "sand blasting and painting of flat, steel or non-ferrous products, prior to their production." (Def.'s Exh. 11 at 11, *Verification of Fafer's Responses*.) Commerce also verified that CD received a cash grant for an uncoiling machine. (Id.) Had record evidence indicated that PFM and CD could not produce or process subject merchandise, Commerce could have concluded that the grants provided to these subsidies were tied to non-subject merchandise and, thus, not countervailable. Substantial evidence supports Commerce's conclusion that the grants were tied to subject merchandise. Plaintiff has provided no evidence suggesting the grants were tied to non-subject merchandise. Therefore, irrespective of actual production, the Court finds PFM and CD do have the ability to manufacture the "class or kind of merchandise" subject to the *CVD Order*.

Fafer manufactures, among other products, coiled steel on a Steckel mill. Steel produced on a Steckel mill which is sold in coils would ordinarily be outside the scope of the *CVD Order*. If, however, the coils were decoiled and slit, and they met the thickness requirements, then the

resulting product would be within the scope of the order. At verification, Commerce confirmed that the Steckel mill in Fafer's facilities was producing coils "less than 10mm thick and maximum 3,000mm wide." *Fafer Verification Report* at 5. Plate as thin as 4.75 mm is included within the scope of the order, so the product manufactured on the Steckel mill is not "too thin to be a cut-to-length carbon steel plate," as one Fafer official claimed at verification. *Id.* A leading industry treatise confirms that "plates up to 3,000mm wide produced via the Steckel route have been available since 1994" from Fafer. (Def.-Intvrs.' App. at Att. 7, Iron and Steel Works of the World 25 (12th ed. 1997), *appended to* Domestic Producers' February 8 Letter at Exh. 2.) As noted earlier, CD received a grant for investment in an uncoiling machine. *See Final Results*, 64 Fed. Reg. at 12,990. At verification, a Fafer official admitted that "the steel sheet and strip in coils which was produced by the Steckel mill was the type of steel that PFM and CD worked with." *Fafer Verification Report* at 5. The official went on to say that CD and PFM "decoil coils made by Fafer or by other suppliers." *Id.*

The *CVD Order* also covers plate products "*whether or not* painted, varnished, or coated with plastics or other nonmetallic substances." 58 Fed. Reg. at 43,749 (emphasis added). PFM received two grants in 1996, one of which was used to purchase sheet metal finishing and painting equipment, and the other of which was used to purchase sand blasting and painting equipment. *Final Results*, 64 Fed. Reg. at 12,990. At verification a Fafer official "explained that PFM was involved in processing steel products that required some type of finishing done to them such as painting or sandblasting" but that "the subject merchandise did not have any of these finishings." *Fafer Verification Report* at 6. This qualification is irrelevant, though, because as stated, subject merchandise is countervailable regardless of whether these finishings are applied.

Additionally, Plaintiff's product brochure indicates that subject merchandise is produced using machinery identical to that purchased with the grants. (Def.-Intvrs.' App. at Att. 10, *Fafer Product Brochure* at 27-28, *appended to* Oct. 8, 1999 Letter from Dewey Ballantine LLP to the U.S. Department of Commerce, Case No. C-423-806.) Moreover, at a public hearing on this issue, when asked if the merchandise that goes through PFM's process of unrolling, cutting and slitting coil produced by Fafer "would fit within the scope of this review," Fafer stated, "[w]ell, yes, well actually as the verification report correctly states, I think they're doing these things for Fafer . . . ." (Id. at 63.) The Court finds this is substantial evidence demonstrating the subsidiaries' ability to manufacture subject merchandise. The fact that Fafer owns between 93 and 99 percent of the two subsidiaries, coupled with the fact that subject merchandise could be produced on the subsidized equipment, warrants a finding that Commerce's determination was supported by substantial evidence and otherwise in accordance with law when it attributed the subsidies to Fafer. It was reasonable to presume that Fafer could use or direct the subsidy benefits of CD and PFM in essentially the same ways it could use its own subsidy benefits.

In an alternate argument, that the Court rejects, Plaintiff contends Commerce can only attribute the subsidies received by CD and PFM to Plaintiff's total sales if the specific plates imported into the United States were produced by CD and PFM. There is nothing in the statute or in case law to suggest that those specific items actually imported into the United States must have benefitted from the subsidies. The countervailing duty statute provides that Commerce must impose countervailing duties if it "determines that the government of a country or any public entity . . . is providing, directly or indirectly, a countervailable subsidy with respect to the

manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely

to be sold) for importation into the United States," 19 U.S.C. § 1671(a)(1) (1999).  The Court

finds this language simply means  "a class or kind of merchandise" (i.e. goods covered by the

scope of the CVD order) must be "imported, or sold (or likely to be sold) for importation into the

United States."  There is no ambiguity in this language.  There is no indication in the statute or in

the legislative history that the legislature intended Commerce to look at the specific items and

determine whether they actually benefitted from the subsidy.

It is well settled law that Commerce is not required to examine the ultimate use of the

subsidy.  So long as a subsidy is provided with respect to the manufacture, production or sale of

subject merchandise, Commerce may impose countervailing duties.  The Court of Appeals for

the Federal Circuit has upheld this policy:

> Congress has expressed the . . . view that an effects test for subsidies has never been
> mandated by the law and is inconsistent with effective enforcement of the countervailing
> duty law.  It would be burdensome and unproductive for the Department of Commerce to
> attempt to trace the use and effect of a subsidy demonstrated to have been provided to
> producers of the subject merchandise.

*Saarstahl A.G. v. United States*, 78 F.2d 1539, 1543 (Fed. Cir. 1996) (quoting North American

Free Trade Agreement Implementation Act, S. Rep. No. 189, 103d Cong., 1st Sess. 42-43 (1993)

(internal quotations omitted).[6]  The Court in *Saarstahl* also held that the countervailing duty

---

[6] Echoing the Court of Appeals, this Court has held that "tracing" a subsidy is not
required:

> "Tracing" as it is commonly understood means to track the subsidy to a particular end-use
> or allocation in order to determine its actual effect.  "Tracing" is impracticable because it
> would require Commerce to follow the expenditure of the subsidy within the foreign
> subsidiary after it is transferred . . . .  A "tracing" requirement would be burdensome and
> contrary to legislative intent because it would undermine the effective enforcement of the

statute "does not limit Commerce to countervailing only subsidies that confer a competitive advantage on merchandise exported to the United States." *Id.* Plaintiff argues that the fact "[t]hat Commerce does not have to calculate what competitive advantage a subsidy may confer once the subject merchandise is imported into the United States, does not negate the statutory requirement that the subsidy has to attach to merchandise imported into the United States to be countervailable." (Pl.'s Reply Br. at 7-8.) However, Plaintiff provides no support for this proposition, never demonstrating what "statutory requirement" mandates that "the subsidy has to attach to merchandise imported into the United States to be countervailable." The Court finds it is enough that Fafer imported subject merchandise into the United States during the period of review, regardless of what machinery was actually used to produce the subject merchandise.

Additionally, there are certain policy considerations that counsel against instituting the requirement Plaintiff seeks to read into the countervailing duty law. Commerce succinctly outlined Plaintiff's approach in its *Final Results*:

> Under FAFER's approach . . . the Department would be required to examine specific sales from subsidized subsidiaries that are capable of producing subject merchandise to determine, on a sale by sale basis, whether the merchandise exported to the U.S. "passed-through" the subsidiary. Then, and only then, under [Plaintiff]'s approach, would a subsidiary's countervailable subsidies be attributable to the subject merchandise.

*Final Results*, 64 Fed. Reg. at 12,990. The Court agrees that this would be an administrative burden not required under the law. The burden on Commerce to track each piece of merchandise to see if it was affected by the subsidy would be enormous. Plaintiff counters that the approach

countervailing duty law.

*Usinor Sacilor v. United States*, 955 F. Supp. 1481, 1489 (Ct. Int'l Trade 1997).

should be case specific. Plaintiff argues that in this case there was only one sale of subject

merchandise to the United States during the period of review, therefore it would have been a

fairly simple task for Commerce to verify its origin. While true in this case, the policy exists to

deal with all of the investigations and reviews Commerce is required to conduct each year. If the

Court were to require the Department of Commerce to make an exception here, it would set a

precedent subject to challenge by every importer. How many sales would the Department of

Commerce be required to examine - under ten, under twenty? The Court will not require

Commerce to trace the use of a subsidy once bestowed. It is enough that the subsidy was

provided, the company used the subsidy to manufacture, produce, or export goods covered by the

scope of the order, and that the company actually imported merchandise covered by the scope of

the order into the United States.

   The Court finds Commerce's decision to attribute the grants to PFM and CD to the total

sales of the Plaintiff is supported by substantial evidence and otherwise in accordance with law.


**B.**   **Commerce's Decision to Expense the PFM Grant in the Year it was Received is**
    **Supported by Substantial Evidence on the Record and Otherwise in Accordance**
    **With Law**


   A.   <u>Parties' Contentions</u>:

    a.   *Plaintiff*

Plaintiff argues Commerce's decision to expense the PFM grant in the year in which it

was received was not supported by substantial evidence and otherwise in accordance with law.

According to Plaintiff, the general rule with respect to non-recurring grants is to allocate them

over the AUL of the grant.  Thus, Commerce's "0.5%" test is an exception to the rule.  Plaintiff

argues, however, that this exception should not be applied where, as here, its application yields a

significantly different substantive result – *e.g.*, moving the rate from a *de minimis* level found in

the *Final Results* to an above *de minimis* countervailable duty.  Rather, the test should be applied

where its application would meet the purpose of the test, namely to relieve administrative burden

in the cases where the impact is minuscule.  As there was no administrative burden here, the test

should not be applied.

### b.        *Defendant and Defendant-Intervenors*

Defendant and Defendant-Intervenors (collectively "defendants") argue Commerce's

decision to expense the PFM grant in the year in which it was received is supported by

substantial evidence on the record and is otherwise in accordance with law.  According to

Defendants, the reason for the "0.5%" test is to alleviate the administrative burden when

considering all investigations and administrative reviews cumulatively.[7]  As Plaintiff does not

contest PFM's grants are less than 0.5% of Fafer's sales value in the year of receipt, Defendants

argue Commerce's application of the 0.5% test was based on substantial evidence on the record

and otherwise in accordance with law.

---

[7] The Final Rule to the 1998 Regulations specifically states:

> If considered only in the context of a single case, the burdens imposed by this
> activity may not appear to be particularly onerous.  However, when considered
> across all investigations and administrative reviews, the cumulative burden
> becomes considerable.

*Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348, 65,394 (Nov. 25, 1998).

B.      Analysis:

The Court need not engage in an extended analysis to reject Plaintiff's argument with respect to this issue.  Commerce's policy at the time of this administrative review was outlined in the General Issues Appendix (GIA):

> Our policy with respect to grants is (1) to expense recurring grants in the year of receipt, and (2) to allocate non-recurring grants over the average useful life of assets in the industry, unless the sum of grants provided under a particular program is less than 0.50 percent of a firm's total or export sales (depending on whether the program is a domestic or export subsidy) in the year in which the grant was received.

58 Fed. Reg. at 37,226.  This longstanding policy was subsequently codified at 19 C.F.R. § 351.524 (1999).  The GIA and subsequent regulation make clear that Commerce will expense grants that are less than 0.50 percent of the firm's total sales.  In its *Amended Final Results*, Commerce determined that "the 1993 and 1996 grants were less than 0.50 percent of total domestic sales in the year that they were given."  64 Fed. Reg. at 18,003.  Plaintiff does not dispute Commerce's finding that the grants were less than 0.50 percent of its total domestic sales in the year given, and provides no support for its proposition that Commerce cannot apply a "policy" such as the 0.5% test when doing so "would yield a significantly different substantive result, namely moving the rate from the 'de minimis' level . . . to an above 'de minimis' countervailable duty."  (Pl.'s Br. at 17.) (emphasis omitted)

The Court also rejects Plaintiff's argument that the purpose of the 0.5% test is to ease the administrative burden of amortizing small grants, and that no such burden exists here since the grants in question were already amortized.  The Court agrees that on a case-by-case basis the administrative burden may not appear overwhelming, but the test was designed to reduce the

burden over the entire spectrum of agency investigations and reviews.  In the preamble to 19

C.F.R. § 351.524 (1999), Commerce explained that the 0.50 percent rule avoids the need for

Commerce to: "(1) Collect, analyze, and verify the data needed to allocate such benefits over

time; and (2) keep track of the allocation calculations for minuscule subsidies from year to year."

63 Fed. Reg. at 65,394.  The reason this is important is that "[i]f considered only in the context of

a single case, the burdens imposed by this activity may not appear to be particularly onerous.

However, when considered across all investigations and administrative reviews, the cumulative

burden becomes considerable."  *Id*.

The Court finds Commerce's application of the 0.5% test was supported by substantial

evidence and otherwise in accordance with the applicable law.

**C.      Commerce Made a "Ministerial Error" in Initially Amortizing The Subsidies Over
The Average Useful Life Of The Subsidy Rather Than Applying Its "0.5% Test"
That Was Properly Corrected Pursuant To 19 U.S.C. § 1675(h)**

1.      Parties' Contentions:

a.      *Plaintiff*

Plaintiff argues if the Court allows the inclusion of subsidies to CD and PFM in the

calculation of Fafer's countervailing duty margin, the Court should not accept petitioners'

assertion that Commerce's error in amortizing the subsidies over the average useful life of the

subsidy instead of expensing it under Commerce's "0.5%" test was ministerial.  (Pl.'s Br. at 13-

14.)  Plaintiff argues the error here does not fall within the statutory definition of "ministerial

error" as it was an error related to the Department's calculation methodology rather than a

problem with addition or subtraction. (Id. at 13, citing 19 U.S.C. § 1675(h))  Further, Plaintiff argues Commerce's "0.5%" test is discretionary and thus once Commerce has exercised its discretion any subsequent changes would no longer be ministerial.  (Id. at 16.)

> b.      *Defendant and Defendant-Intervenors*

Defendants argue the error was ministerial.  Defendant-Intervenors reason that the error was ministerial because while Commerce announced its intention to "employ the standard grant methodology" outlined in the General Issues Appendix (GIA), which includes the application of a grant less than 0.5% of the firm's total or export sales to the year within which the grant was received, it inadvertently failed to do so here with respect to CD and PFM.  Commerce also states, in the *Amended Final Results*, that it intended to employ the standard grant allocation methodology as explained in the GIA with respect to the CD and PFM grants but "inadvertently failed to apply the 0.50 percent test to the CD and PFM grants."  64 Fed. Reg. at 18,002. Defendant and Defendant-Intervenors maintain the Court must defer to Commerce's interpretation and application of the law.

> 2.      Analysis:

"Ministerial error" is defined as including "errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and *any other type of unintentional error which the administering authority considers ministerial*." 19 U.S.C. § 1675(h) (West Supp. 1999) (emphasis added).  The administering authority, in this case Commerce, has adopted the statutory definition of "ministerial error" in its regulation.  *See*

19 C.F.R. § 351.224(f) (2000).  This Court has frequently granted Commerce broad discretion in determining what constitutes a ministerial error.  *See, e.g., Cemex, S.A. v. United States*, 19 CIT 587, 593 (1995) ("Commerce is given fairly broad discretion to determine which types of unintentional error to regard as ministerial.").  Moreover, the Court has recognized where Commerce identifies its error as "inadvertent," the Court may uphold the correction as a ministerial error.  *See, e.g., Geneva Steel v. United States*, 914 F. Supp. 563, 607 (Ct. Int'l Trade 1996) (basing, in part, its conclusion that Commerce's failure to aggregate the grants received was an error of addition and therefore a ministerial error on Commerce's characterization of the error as "inadvertent").

Here, Commerce characterized its error in not applying the 0.5% test as "inadvertent." Commerce determined it was inadvertent because, in part, the *Final Results* indicated that Commerce intended to employ "the standard grant methodology outlined in the allocation section of the GIA."  64 Fed. Reg. at 12,984.  The GIA states it is Commerce's policy to allocate non-recurring grants over the average useful life (AUL) of the grant "unless the sum of grants provided under a particular program in a given year is less than 0.50 percent of a firm's total or export sales . . . in the year in which the grant was received."  58 Fed. Reg. at 37,226; *see also Proposed Regulations*, 54 Fed. Reg. at 23,384 (which was subsequently codified at 19 C.F.R. § 351.524(b)(2) (1999)).  However, Commerce failed to apply its standard grant methodology.  The Court finds it relevant that Commerce applied the 0.5% test with respect to other grants in this investigation.[8]  Obviously, Commerce understood the standard grant methodology to include the

---

[8] Due to the proprietary nature of this information the Court declines to provide additional detail on these grants.

0.5% test under those circumstances described in the GIA. The Court finds Commerce's failure to apply the 0.5% test to the PFM and CD grants was due to inadvertence, and falls within the definition of a ministerial error. Additionally, because there is substantial evidence to support Commerce's decision to expense the grant to PFM in the year it was received, the Court finds Commerce's error in failing to apply the 0.5% test in the *Final Results* was a ministerial error properly corrected in the *Amended Final Results*.

Fafer argues the nature of the error was methodological rather than ministerial and Commerce's original allocation in the *Final Results* was proper. The Court notes this issue has been addressed in *Geneva Steel*, 914 F. Supp. 563 (Ct. Int'l Trade 1996). There, this Court held that since substantial evidence supported Commerce's decision to aggregate grants received by the subject company, Commerce's error in failing to aggregate the grants was a ministerial error properly corrected in the amended determination. *Id*. at 607. This Court also noted that its findings did not accord Commerce "unbridled discretion" to determine when an act in ministerial. The Court finds Commerce simply "made an error, not resulting from ill-considered judgment or wayward discretion, but from oversight." *Id*. at 608 (quoting *Companhia Brasileira Carbureto de Calcio v. United States*, 18 CIT 215, 218 (1994)) (internal quotations omitted). This decision merely "reflects the deference courts afford agency interpretations of statutes and the regulations implementing such statutes." *Geneva Steel*, 914 F. Supp. at 607-08 (citing *Daewoo Elecs. Co., Ltd. v. Int'l Union of Elec. Workers, AFL-CIO*, 6 F.3d 1511, 1522 (Fed. Cir. 1993). Similarly, in the present case, the facts warrant the grant of an equal amount of discretion. Accordingly, the Court finds Commerce's decision to treat the error as ministerial is supported by substantial evidence, otherwise in accordance with law, and sustains Commerce's *Amended*

*Final Results*.


**CONCLUSION**

For the reasons stated above, the Court finds Commerce's *Final Results* and *Amended*

*Final Results* are supported by substantial evidence and otherwise in accordance with law.

Plaintiff's motion is denied.


                                        _____

                                        Gregory W. Carman,
                                        Chief Judge

Dated: June 6, 2001
        New York, New York